## Commonwealth v. Pal

C.P. of Lackawanna County, No. 13 CR 2269

*Eugene M. Talerico, Jr., William J. Fisher, Brian J. Gallagher* and *Jamie L. Davis*, for Commonwealth.
*William C. Costopoulos*, for defendant.

NEALON, *J.*, Jan. 9, 2015—Defendant has filed post-sentence motions seeking a judgment of acquittal, an arrest of judgment and a new trial following his convictions and sentencing for first-degree murder as an accomplice and criminal conspiracy to commit first-degree murder.

Defendant seeks a judgment of acquittal due to the alleged insufficiency of the evidence, and alternatively requests that his first-degree murder verdict be molded to third-degree murder based upon his co-defendant's conviction for third-degree murder as the principal. Defendant also seeks a new trial on the alleged grounds that (1) the verdict was against the weight of the evidence, (2) a change of venue should have been granted, (3) each prospective juror should have been subjected to individual voir dire, and (4) evidence of his other "bad acts" was erroneously admitted in violation of Pa.R.E. 404(b).

Viewing the trial evidence in the light most favorable to the Commonwealth as the verdict winner, the direct and circumstantial evidence was sufficient to enable the jury to find defendant guilty of first-degree murder as an accomplice and conspiracy to commit that offense. Since 18 Pa.C.S.A. § 306(g) expressly states that an accomplice may be convicted of a crime even though the principal who committed the underlying offense has been convicted of a lesser offense, and the Supreme Court of Pennsylvania has upheld first-degree murder and conspiracy convictions of accomplices notwithstanding the acquittal or third-degree murder conviction of the principals, defendant's motion to mold his first-degree murder verdict to third-degree murder will be denied. Furthermore, inasmuch as the guilty verdicts do not shock the conscience of the court, defendant's challenge to the weight of the evidence will also be denied.

The pretrial publicity exhibits reflect that the relevant conventional news coverage and social media were not presumptively prejudicial to defendant. Since any members of the venire who had formed fixed opinions based upon pretrial publicity, or could not agree to set aside

any such information, were removed from the jury pool, the pretrial publicity did not cause prejudice by preventing the empaneling of an impartial jury. Therefore, a change of venue was not warranted under federal or state law.

Individual voir dire of each prospective juror was not required since defendant did not establish the existence of prejudicial pretrial publicity. Moreover, defense counsel was never denied the opportunity to conduct individual voir dire of any potential juror during the jury selection process. Finally, the only evidence that was allowed of "other acts" by defendant before and after the murder was admissible under the "opportunity" exception in Rule 404(b)(2), had the requisite "connective relevance" to the crime in question, and possessed probative value that outweighed its potential for unfair prejudice. Consequently, defendant's requests for a judgment of acquittal, an arrest of judgment and a new trial will be denied.

## I. FACTUAL BACKGROUND

### (A) INTRODUCTION

On July 20, 2013, the Dunmore Police Department initiated a "missing person" investigation upon being advised by the mother of Frank Bonacci ("Bonacci") that Bonacci had failed to report to work or home on that date. (Transcript of Proceedings ("T. P.") on 6/3/14 at pp. 111-112; T. P. 6/5/14 at pp. 52-53; T. P. 6/11/14 at p. 39). The preliminary police investigation revealed that Bonacci had last been seen alive at 6:50 AM on July 20, 2013, as he was leaving the Linden Street residence of defendant, Neil Pal ("Pal"), with Jason Dominick ("Dominick") and Pal and walking to Bonacci's Jeep Liberty after Pal had announced that he was driving Bonacci and Dominick to their homes in Bonacci's vehicle. (T. P. 6/3/14 at pp. 136-

138; T. P. 6/5/14 at pp. 54-66; T. P. 6/9/14 at pp. 96, 125-126, 248, 265; T. P. 6/11/14 at pp. 42-43). On July 27, 2013, Bonacci's decomposing body was discovered in the front passenger side of his Jeep Liberty at the bottom of a steep embankment in a densely wooded area near the Roaring Brook Step Falls in Scranton, which is located less than one mile from Pal's residence on Linden Street. (T. P. 6/3/14 at p. 200; T. P. 6/5/14 at pp. 178-179, 220; T. P. 6/9/14 at pp. 14-22; T. P. 6/10/14 at pp. 7-10, 12, 14, 80, 113, 132-134, 141-145; T. P. 6/11/14 at p. 39).

Upon arrival at the Step Falls crime scene, the Scranton Police Department detectives found a fifty pound rock placed on the accelerator of Bonacci's vehicle, and tire acceleration marks or "burnout tracks" above the steep embankment, indicating that Bonacci was not operating his Jeep when it plunged down the seventy-two foot ravine. (T. P. 6/10/14 at pp. 119-125, 220-221; T. P. 6/11/14 at p. 40). During Bonacci's autopsy, Gary Ross, M.D., retrieved a wad cutter bullet that was imbedded in Bonacci's upper cervical spine and which had been fired from a .38 or .357 caliber handgun. (T. P. 6/10/14 at pp. 37-38, 41, 44, 84; T. P. 6/11/14 at pp. 27-28, 35, 41-42; Commonwealth Exhibit nos. 50, 53). Bonacci's autopsy also revealed that Bonacci's blood alcohol level at the time of his murder was .312%, which is almost four times the legal intoxication limit. (T. P. 6/10/14 at pp. 28-29).

Based upon the blood flow patterns and saturation on Bonacci's clothing and throughout his vehicle, Dr. Gary Ross and the homicide detectives concluded that Bonacci was seated in the front passenger seat at the time that he was shot. (T. P. 6/10/14 at pp. 35-36, 41, 50-60, 63, 75, 206-214, 243-245). Due to the location and trajectory of Bonacci's fatal wound and the bloodstain patterns on the

seat and console, Dr. Ross opined that the fatal "shot came from behind" while the barrel of the gun was less than one inch from the wound entry point, immediately prior to the vehicle being driven over the embankment. (*Id.* at pp. 40, 42-43, 67, 71-73, 75, 214-220, 233-236). Bonacci's cause of death was determined to be "a single gunshot wound to the head," and his manner of death was characterized as a "homicide." (*Id.* at pp. 15, 32; Commonwealth's Exhibit no. 49).

### (B) PAL — DOMINICK RELATIONSHIP

The investigators discovered that Pal and Dominick were "best friends" who "were like brothers" since elementary school. (T. P. 6/3/14 at pp. 221-222, 252-253; T. P. 6/9/14 at p. 48). In fact, they both had tattoos of symbols and lettering for the word "*b'hai*," which means "brother" in hindi. (T. P. 6/11/14 at pp. 99-101; Commonwealth Exhibit nos. 212-213). In describing their relationship, mutual friends stated that Pal is "a stronger person than Jason" Dominick, (T. P. 6/5/14 at p. 149), and that "Neil [Pal] is the leader" while "Jason [Dominick] is the follower." (T. P. 6/4/14 at p. 56).

Although Dominick did not own a gun, (T. P. 6/5/14 at pp. 88-89, 182-183; T. P. 6/9/14 at pp. 30-37), Pal was known to own or possess several handguns, including an unregistered .38 caliber handgun. (T. P. 6/3/14 at p. 217; T. P. 6/4/14 at pp. 21-22; T. P. 6/5/14 at pp. 87-88). Pal would often carry a handgun in public and would openly display it in the waistband of his pants. (T. P. 6/3/14 at pp. 223-224, 225; T. P. 6/10/14 at pp. 187-188). Pal had a "man cave" in his large garage where Pal and his friends would drink alcohol, watch television, and fire wad cutter bullets into the garage wall using handguns and ammunition owned by Pal. (T. P. 6/3/14 at pp. 174-175, 190-191, 206-

207, 249; T. P. 6/4/14 at pp. 19, 22-23, 65-67, 210; T. P. 6/5/14 at pp. 17, 19, 36, 46; T. P. 6/10/14 at pp. 166, 168, 170-174, 178-185, 188-192,237-240).

In late 2012, Pal's friend, Cameron Kashmer, purchased an unregistered .38 caliber handgun from a guest at Pal's garage. (T. P. 6/5/14 at p. 20). In March 2013, Mr. Kashmer provided that unregistered .38 caliber handgun to Pal as partial payment of an outstanding debt that he owed to Pal. (*Id.* at pp. 20-22, 26, 28-30, 39, 51). Before agreeing to accept that handgun, Pal loaded it with wad cutter bullets that he kept under his desk in the garage, and fired a bullet from that handgun into the wall of his garage. (*Id.* at pp. 30-32, 40-41).

### (C) DOMINICK-BONACCI HOSTILITY

Early in their investigation, the homicide detectives learned of a recent history of animosity between Dominick and Bonacci involving Dominick's long time paramour, Keri Tucker. (T. P. 6/3/14 at p. 203; T. P. 6/11/14 at pp. 44-45). Dominick's volatile relationship with Ms. Tucker was plagued by mutual infidelity and frequent breakups. (T. P. 6/3/14 at pp. 201-202; T. P. 6/4/14 at pp. 12-13; T. P. 6/5/14 at p. 69). Friends described Dominick as "obsessed" with Ms. Tucker and subject to uncontrollable fits of jealousy regardless of whether they were dating or separated at the time. (T. P. 6/3/14 at p. 201; T. P. 6/4/14 at pp. 51, 53, 144; T. P. 6/5/14 at pp. 71, 157).

Ms. Tucker stated that whenever Dominick and Ms. Tucker would separate temporarily, Dominick would become "exhausting because he would always worry about who I was with or what I would be doing." (T. P. 6/5/14 at pp. 70-71). For example, when Dominick's friend, Christopher Genovese, contacted Ms. Tucker

during an interval when Dominick and Ms. Tucker were not dating, Pal warned Mr. Genovese that "you two are going to rumble." (T. P. 6/4/14 at pp. 55-56). Upon learning about Mr. Genovese's contact with Ms. Tucker, Dominick became enraged and travelled to Mr. Genovese's place of employment where Dominick "sucker punched" Mr. Genovese so hard that he fell to the ground. (T. P. 6/4/14 at pp. 14-17, 44-45; T. P. 6/5/14 at pp. 162-164).

From March 2013 through May 2013, Bonacci and Ms. Tucker were engaged in a romantic relationship during one of her periods of separation from Dominick. (T. P. 6/5/14 at pp. 73-74; T. P. 6/9/14 at pp. 48-49; T. P. 6/11/14 at p. 44). On May 5, 2013, Dominick sent a text message to Pal stating "just so you know, Neil, I'm cool with your boy Frank [Bonacci], but if he ever gets cocky around me I will just snuff him." (T. P. 6/9/14 at p. 49-50, 135). Bonacci and Ms. Tucker ceased dating in May 2013, and she resumed her relationship with Dominick. (T. P. 6/5/14 at pp. 74-76).

On June 8, 2013, Bonacci became upset upon seeing Dominick and Ms. Tucker together at a bar, and as he left the bar, Bonacci intentionally bumped Ms. Tucker with his shoulder. (T. P. 6/5/14 at pp. 74-77, 177; T. P. 6/9/14 at pp. 50-52). Upon leaving the bar, Bonacci sent a text message to Dominick, which read:

> "Bro, you shook my hand tonight and said everything was good...wtf? haha, you did real good, I f ---ed her last night...have fun with your broken woman"

(T. P. 6/5/14 at p. 78; T. P. 6/9/14 at p. 52; Commonwealth Exhibit no. 46). Dominick became incensed upon reading that text message, and contacted Bonacci by cell phone and demanded that Bonacci meet him at Step Falls in order

to fight. (T. P. 6/5/14 at pp. 78-79; T. P. 6/9/14 at pp. 52-53). Bonacci immediately forwarded a text message to Pal stating "yo, your boy Jason [Dominick] is trying to fight me right now." (T. P. 6/9/14 at pp.53-54; Commonwealth Exhibit no. 46). Pal promptly travelled to the Step Falls entry point where he met Dominick and Ms. Tucker, and spoke to Bonacci by phone and encouraged Bonacci to travel to Step Falls to fight Dominick. (T. P. 6/5/14 at pp. 81, 83-86, 178-179; T. P. 6/9/14 at pp. 55-60; T.P. 6/11/14 at pp. 45-46). However, Bonacci never appeared for that fight. (T. P. 6/5/14 at p. 86; T. P. 6/9/14 at p. 130; T. P. 6/11/14 at p. 46).

(D) 7/18/13-7/19/13

During the early morning hours of Thursday, July 18, 2013, Ms. Tucker was lying next to Dominick in bed when she received the following unsolicited text message from Bonacci:

> "Sorry it's late, but hey I just wanted to say I'm sorry for everything I did when we were together...that wasn't the real me at the time...I know it sounds f ---ed up but I felt different about you than I did with other girls and I really care about you and always will."

(T. P. 6/5/14 at pp. 94-96, 162; T. P. 6/9/14 at p. 61; Commonwealth Exhibit no. 32).

Dominick read that text message from Bonacci and proceeded to get out of bed and leave Ms. Tucker's bedroom. (T. P. 6/5/14 at p. 95; T. P. 6/9/14 at pp. 61-62). As a result, Dominick never viewed the ensuing text message from Bonacci, which stated "[a]nd I really hope the best ever for you and that you [will] be happy in everything you do...sorry it seems random but it took me awhile to get over you to be okay." (T. P. 6/5/14 at p. 96; T.

P. 6/9/14 at p. 61; Commonwealth Exhibit no. 32).

While Dominick was attending a party at Pal's residence from Thursday evening, July 18, 2013, to Friday morning, July 19, 2013, he forwarded a text message to Ms. Tucker at 12:04 AM on July 19, 2013, stating that "your boyfriend Frankie [Bonacci] is here, wouldn't be surprised if he is texting you because he knows I'm here and not with you." (T.P. 6/5/14 at pp. 94, 97; T. P. 6/9/14 at pp. 62-63; Commonwealth Exhibit no. 31). After Bonacci left Pal's party, Dominick sent another text message to Ms. Tucker at 12:25 AM which read "I hope he didn't leave to see you." (T. P. 6/5/14 at p. 99; T. P. 6/9/14 at p. 63). In response, Ms. Tucker unsuccessfully attempted to contact Dominick on his cell phone, and at 12:38 AM, Dominick texted Ms. Tucker and stated "I can't hear you...please sleep alone tonight." (T. P. 6/5/14 at pp. 99-100; T. P. 6/9/14 at p. 64).

At 4:56 AM on July 19, 2013, Dominick again texted Ms. Tucker and reported that he was "in front of your boyfriend Frank [Bonacci]" and was travelling to the hospital to visit a friend who was in "a seriously bad accident." (T. P. 6/5/14 at p. 101; T. P. 6/9/14 at p. 64; Commonwealth Exhibit no. 31). In that same text message, Dominick stated that "if you don't want me to go to your house after, f-ck off and stop talking to me." (T. P. 6/5/14 at pp. 101, 166; T. P. 6/9/14 at p. 64). Shortly before 8:00 AM, an inebriated Dominick appeared at Ms. Tucker's apartment, initiated an argument concerning the presence of her friends there, and engaged in a verbal and physical altercation with Ms. Tucker. (T. P.6/5/14 at pp. 102-104, 166-167; T. P. 6/9/14 at p. 64).

After Ms. Tucker ordered Dominick to leave her apartment, Dominick transmitted a series of text messages to Ms. Tucker between 8:07 AM and 8:17 AM, reflecting

his emotional instability and suicidal threats. (T. P. 6/5/14 at pp. 104, 167; T. P. 6/9/14 at pp. 64-65). In those text messages, Dominick declared:

> Watch how you regret what you did to me this morning when you find out on the news what happened...See you on Newswatch 16 in your back alley...actually I mean the expressway...it's a lot easier and it's right there...I'm so tired of it all, I really am...then I will set you free. Please tell my sisters I love them."

(T. P. 6/5/14 at pp. 105-107, 168, 170; T. P. 6/9/14 at p. 65). Twenty minutes later,

Dominick forwarded another text message to Ms. Tucker, which read:

> "If you're not gonna stop me now, you're gonna find a hard reality if you think I'm kidding...Salute Keri Lee Tucker, I love you much...Tell my sisters I love them and my brother to try and try very hard and my parents to keep pushing to serenity. I love you...I really tried, babe...my towel is yours...it's behind your house by the expressway."

(T. P. 6/5/14 at pp. 108, 170; T. P. 6/9/14 at p. 65). Ms. Tucker learned later that morning that Dominick was still present in her backyard, and he sent her a text message demanding that he be allowed entry to her apartment for a cigarette and drink of water and threatening to throw her visitors out the window along with her air conditioner. (T. P. 6/5/14 at pp. 170-172, 184-185).

### (E) 7/19/13 — 7/20/13 PARTY AT PAL'S RESIDENCE

Within hours of Dominick's transmission of the disturbing text messages quoted above, Pal hosted another party at his Linden Street residence beginning at 3:00 PM

on Friday, July 19, 2013. (T. P. 6/3/14 at pp. 175-176). The individuals in attendance, including Dominick, were consuming alcohol and playing a drinking game called "flip cup" on Pal's rear porch deck. (*Id.* at pp. 127-132, 178-179, 220; T. P. 6/4/14 at pp. 30, 33, 36-37, 40, 73-76, 118,191,227; T.P. 6/5/14 at pp. 108-109).

Between 1:09 AM and 1:27 AM on July 20, 2013, Bonacci and Jamison Colarusso exchanged a series of text messages in which Mr. Colarusso indicated that he was present at the party at Pal's residence, and Bonacci stated that he might join him at the party. (T. P. 6/4/14 at pp. 122, 124; T. P. 6/9/14 at p. 70). Since it was "common knowledge" that Dominick and Bonacci had "problems" between them, Mr. Colarusso texted Bonacci that "Jason [Dominick] is here to let you know." (T. P. 6/4/14 at pp. 124-125; T. P. 6/9/14 at p.70). After Bonacci replied "why, what's up with Jason [Dominick]," Mr. Colarusso answered "I don't know, never mind." (T. P. 6/4/14 at p. 127; T. P. 6/9/14 at pp. 70-71).

At 2:00 AM, Bonacci forwarded a text message to Mr. Colarusso and asked him to "let Neil [Pal] know I'm stopping by." (T. P. 6/4/14 at pp. 127-128; T. P. 6/9/14 at p. 72). Mr. Colarusso informed Dominick that Bonacci was en route to the party, and upon asking Dominick "if everything would be cool," Dominick replied "just as long as [Bonacci] doesn't open his mouth" or "get cocky with me." (T. P. 6/4/14 at p. 131; T. P. 6/9/14 at p.71). While drinking on the porch deck, Dominick and Christopher Genovese were recounting their past physical fights with other individuals and their need "to grow up," and Dominick remarked that the "only time he would fight is if Neil [Pal] called him." (T. P. 6/4/14 at pp. 42-43).

Bonacci arrived at Pal's residence at approximately

2:30 AM, and participated in "flip cup" games during the next few hours. (T. P. 6/3/14 at pp. 129-130, 179; T. P. 6/4/14 at pp. 26, 33, 36, 40, 73, 119, 190). The party at Pal's residence lasted in excess of fourteen hours, and several party guests, including Sean Baress, Joseph Baress, Jamison Colarusso, Sam Senuk, Alyssa Antonio and Brianna Shaughnessy, spent the night there. (T. P. 6/3/14 at pp. 132-133, 181; T. P. 6/4/14 at pp. 233, 235, 240-242). Since Bonacci had consumed a considerable amount of alcohol, Mr. Colarusso suggested to Pal that Bonacci also stay there, but Pal made a facial expression which clearly displayed his disapproval. (T. P. 6/4/14 at pp. 134-136, 139-140). As Sam Senuk and Alyssa Antonio were going to bed between 3:30 AM and 3:45 AM, Pal told Mr. Senuk that "somebody is messing with Frankie [Bonacci]." (T. P. 6/4/14 at pp. 78-80, 85, 99-100, 103, 105; T. P. 6/9/14 at pp. 147-148).

By 6:00 AM, most of the party guests had either retired or departed, and only Dominick, Pal, Bonacci and Brandon Emily remained on Pal's rear deck. (T. P. 6/3/14 at pp. 133-134, 139; T. P. 6/11/14 at pp. 47-48). At that time, Dominick was wearing a tee shirt, cargo shirts and white sneakers, and Pal was wearing a black collared shirt and khaki shorts. (T. P. 6/4/14 at pp. 195-197). While Mr. Emily was waiting on the deck for a ride home from his roommate, Pal announced that he was driving Bonacci and Dominick to their residences in Bonacci's Jeep. (T. P. 6/3/14 at pp. 136-138; T. P. 6/11/14 at pp. 47-48). At approximately 6:50 AM, Mr. Emily observed Dominick, Pal and Bonacci exit the porch deck and walk toward the alley where Bonacci's Jeep was parked. (T. P. 6/3/14 at p. 140-141, 143). In the process, they walked past Pal's own vehicle which was parked at the foot of the deck steps and located closer to Pal's residence than Bonacci's Jeep. (*Id.*

at pp. 141,161).

Within a matter of seconds, Mr. Emily heard Bonacci's Jeep start and travel "up the court towards Linden" Street. (*Id.* at pp. 143-146). A University of Scranton surveillance camera, which was located a few blocks from Pal's residence, videotaped Bonacci's Jeep as it crossed nearby railroad tracks and approached the access road for Step Falls at 6:51 AM. (T. P. 6/11/14 at pp. 49-52; Commonwealth Exhibit no. 209). At 7:00 AM, Mr. Emily heard a car horn and walked to the alley near Pal's house to see if his roommate had arrived, but observed no vehicles in the court where Bonacci's Jeep had been parked. (T. P. 6/3/14 at pp. 150-151). Mr. Emily's roommate arrived at Pal's residence at 7:11 AM, and Mr. Emily departed with him. (*Id.* at pp. 166-167; T. P. 6/11/14 at pp. 48-49).

At 7:18 AM, Pal called his close friend, Maribeth Castaldi, asked her "where [she] was," "who [she] was with" and "what [she] was doing," and Ms. Castaldi informed Pal that she was home alone and getting ready for work. (T. P. 6/3/14 at pp. 229-230; T. P. 6/11/14 at p. 55). Pal instructed Ms. Castaldi to "drive towards his house and then to call him." (T. P. 6/3/14 at p. 231). Between 7:22 AM and 7:33 AM, Pal and Ms. Castaldi engaged in a series of cell phone conversations during which Pal directed her to his location, and Ms. Castaldi eventually observed Pal and Dominick standing on the berm of Route 81 South in the general proximity of Step Falls. (*Id.* at pp. 232-239, 245-246, 258-264; T. P. 6/11/14 at p. 56; Commonwealth Exhibit nos. 7-8). Pal and Dominick both looked and acted "normal" as she drove them to Pal's residence, and gave "no reason to believe that anything out of the ordinary had just happened." (T. P. 6/3/14 at pp. 239, 241-244).

(F) PAL'S POST-MURDER CONDUCT

Pal's actions immediately following the murder and during the ensuing twelve days were designed to leave the impression that he and Dominick had not been involved with the disappearance and murder of Bonacci. Within an hour of the return of Pal and Dominick to Pal's residence, Sam Senuk's mother arrived at Pal's residence at 8:30 AM to inform Mr. Senuk that he had overslept for work, and Dominick awakened Mr. Senuk and Alyssa Antonio to advise them that Mr. Senuk's mother was there. (T. P. 6/4/14 at pp. 81, 199). At that time, Dominick was no longer wearing a tee shirt, cargo shorts and white sneakers, and instead was shirtless and wearing basketball shorts and flip flops. (*Id.* at pp. 200, 215-216). Pal was likewise wearing basketball shorts as opposed to the khaki shorts that he wore during the party. (*Id.* at pp. 201, 207). Pal and Dominick both had normal demeanors and appearances at that time. (*Id.* at p. 203).

Shortly thereafter, Briana Shaughnessy's ride arrived, and when she awoke and departed, Pal and Dominick did not look or act out of the ordinary. (*Id.* at pp. 237-238, 272). Pal and Dominick then proceeded to awaken Sean Baress by tickling his face with their fingers. (T. P. 6/3/14 at p. 182). Pal and Dominick both appeared "normal" and "fine" to Mr. Baress. (*Id.* at pp. 182-183). Once Mr. Baress and his brother, Joseph Baress, were awakened, Pal and Dominick went to breakfast at a diner with the Baresses and Alyssa Antonio. (*Id.* at 183; T. P. 6/4/14 at pp. 203-204).

The surveillance videotape at the diner reflects that Pal and Dominick were talkative and acting normally at the diner, and both men ate hearty breakfasts. (T. P. 6/4/14 at pp. 205-210, 217; Commonwealth Exhibit no. 22). The videotape also depicts Dominick wearing a pink button-

down shirt, rather than the tee shirt that he had been wearing when he walked to Bonacci's vehicle with Pal earlier that morning. (T. P. 6/4/14 at pp. 208, 216). When the waitress at the diner asked them if they "need[ed] anything else" after they had eaten, Pal replied "[h]ow about your number?" (*Id.* at p. 281).

The cell phone records for Pal and Dominick reflect that following their breakfast at the diner, Pal and Dominick telephoned each other eighteen times on July 20, 2013.[1] (T. P. 6/9/14 at p. 79). At 1:49 PM on the day of the murder, Pal forwarded a text message to Brianna Shaughnessy asking her to "find [him]" a girlfriend. (T. P. 6/4/14 at pp. 243, 246). Even though Pal admittedly knew that Bonacci was already dead, (T. P. 6/11/14 at pp. 227-228), he called Bonacci's cell phone at 2:41 PM on July 20, 2013, in an apparent effort to convey the impression that Pal believed that Bonacci was alive. (T. P. 6/9/14 at p. 77). On that same afternoon, Pal posted a non-private message on Bonacci's Facebook wall stating "call me brotha" and "TD [Artabane] is looking for you." (*Id.* at pp. 74-75).

Another party was held at Pal's residence on the evening of Saturday, July 20, 2013, and Brandon Emily attended that party. (T. P. 6/3/14 at p. 147). Mr. Emily asked Pal "where he went" earlier that morning when Pal departed with Bonacci and Dominick, and Pal replied that he walked to view a neighbor's garden, "walked around the block and was talking to his [father's] tenants," and then "came in his front door." (*Id.* at pp. 147-150, 152). At 10:17 PM on July 20, 2013, Pal placed another call to Bonacci's cell

---

1. Those same cell phone records indicate that between July 20, 2013, and their arrests on August 1, 2013, Pal and Dominick exchanged sixty-seven phone calls. (T. P. 6/9/14 at pp. 103, 139).

phone notwithstanding the fact that he knew that Bonacci was dead. (T. P. 6/9/14 at pp. 78, 80). At 11:37 PM on that same night, Shannon Glacken forwarded a text message to Pal asking "[everything okay with Frankie [Bonacci]?" (*Id.* at p. 234). In response, Pal texted "[n]o one knows where he is," "[l]eft my house this morning," "no one has heard from him," and "I'm just sick to my stomach right now." (*Id.* at pp. 234-236).

On July 21, 2013, Pal posted another non-private message on Bonacci's Facebook wall, which stated "where you at?" (*Id.* at pp. 80-81). Later that evening, Pal transmitted a text message to Ms. Glacken, who worked at a local bar that Bonacci frequented, (*Id.* at pp. 230-231), and asked "was [Bonacci] at the bar at all" on July 21, 2013. (*Id.* at pp. 236-237). In a text message exchange with Brianna Shaughnessy on July 22, 2013, Pal stated that witnesses had reported seeing Bonacci alive on Saturday night, July 20, 2013. (T. P. 6/4/14 at p. 261). Similarly, Pal sent a text message to Ms. Glacken on July 22, 2013, claiming that "someone spotted [Bonacci]" at an area swimming hole. (T. P. 6/9/14 at p. 239).

On July 23, 2013, Bonacci's mother sent a Facebook message to Pal inquiring as to the time that Bonacci left Pal's residence on July 20, 2013. In response, Pal stated that Bonacci left at 7:00 AM, and Pal told Bonacci's mother "you can call me anytime." (T. P. 6/3/14 at pp. 113-114; Commonwealth Exhibit no. 1). Pal and Dominick were interviewed by the Dunmore Police later that day, (T. P. 6/5/14 at pp. 54-56), and immediately prior to their separate interviews, Pal and Dominick exchanged five cell phone calls. (T. P. 6/9/14 at pp. 83-84). During his interview, Pal stated that although he had originally intended to drive Bonacci and Dominick home on the morning of July 20,

2013, Bonacci reconsidered Pal's offer, decided to drive his own vehicle, and departed Pal's residence alone. (T. P. 6/5/14 at pp. 58, 63; Commonwealth Exhibit no. 30). Pal advised the Dunmore Police that Bonacci had a cocaine addiction, and provided the name of an individual who reportedly saw Bonacci alive on Monday, July 22, 2013. (*Id.*). At the conclusion of his interview, Pal stated that Bonacci "was" one of his best friends, and the police made note of Pal's reference to Bonacci in the past tense. (*Id.*).

Following their interviews by the Dunmore Police, Pal and Dominick traveled to a local business where friends and family of Bonacci were gathering to organize search parties for Bonacci. (T. P. 6/5/14 at pp. 59-60). One of the people present, Courtlind Davis, noticed that when Bonacci's grandfather was addressing the group, Dominick had "tears in his eyes" and "was crying," and Dominick's former girlfriend, Lindsey Hannick, told Ms. Davis that Dominick only cries "when he is lying" or hiding something. (T. P. 6/9/14 at pp. 269, 271, 275). During the search party gathering, a Bonacci family friend, Connie Hayes, approached Pal and stated "Neil [Pal], we have to find Frankie because [his mother] is so dependent on him." (*Id.* at pp. 199-201, 203). In reply, Pal "took [her] hand and kissed [her] hand, looked [her] in the eyes and said '[d]on't worry, we'll find him.'" (*Id.* at p. 203).

Ashley Levandoski and Monica Rinaldi rode with Pal in his vehicle as they searched for Bonacci in East Scranton on July 23, 2013. (T. P. 6/5/14 at pp. 189, 205). Although Ms. Levandoski and Ms. Rinaldi voiced their desire to search the Step Falls area, Pal stated that there was "no point in [them] going back there," and he refused to drive their group to Step Falls and said it would be a "waste of time." (*Id.* at pp. 193-194, 196-197, 210-212).

On July 24, 2013, Pal once again placed a telephone call to Bonacci's cell phone. (T. P. 6/9/14 at pp. 85, 105). On that same date, Bonacci's uncle sent a Facebook message to Pal asking if he knew "where my nephew is," and Pal answered "[n]o, we looked everywhere today," "Frankie is one of my best friends and I love him," and "I'm sick to my stomach." (T. P. 6/5/14 at pp. 7-8). During another search party undertaken on July 24, 2013, Pal informed Courtlind Davis and Lindsey Hannick that he was traveling to Wilkes-Barre to search for Bonacci, but a short time later, Ms. Davis and Ms. Hannick spotted Pal behind his Linden Street residence combing through his neighbor's garbage cans. (T. P. 6/9/14 at pp. 278-281).

On July 24, 2013, Pal also sent a text message to Ms. Glacken stating "let me know if you talk to detectives." (*Id.* at p. 245). While Bonacci was still missing, Maribeth Castaldi's boyfriend, Sean Baress, asked Pal "why he had Maribeth [Castaldi] pick him up on the side of the highway above the Nay Aug Park area." (T. P. 6/3/14 at p. 187). Pal told Mr. Baress "not to worry about it," and advised Mr. Baress that if the police asked him about it, he was "to lie" and say that Pal "was calling Maribeth [Castaldi] to pick Mr. Baress up" at Pal's house. (*Id.* at pp. 187-188). When a search party member, David Edsell, later saw Pal on July 26, 2013, Pal "said that Frankie Bonacci was ruining his f ---ng life because...every one was blaming him" for Bonacci's disappearance. (T. P. 6/9/14 at p. 221).

As stated above, Bonacci's body and vehicle were discovered on the evening of July 27, 2013, at the bottom of an embankment near Step Falls. (T. P. 6/5/14 at pp. 130-131). When Bonacci's uncle posted on Facebook that Bonacci had been found, Pal replied "any news on cause of death yet?" (*Id.* at p. 11). After Bonacci's uncle responded

"no word yet," Pal stated "[h]ope all is well." (*Id.* at p. 13). Upon receiving a comparable text message from Monica Rinaldi concerning the discovery of Bonacci, Pal texted "is he okay" and "is it his Jeep?" (*Id.* at pp. 215-219).

Following the discovery of Bonacci's body on July 27, 2013, Pal publicly posted on his Facebook page "sick to my stomach" and "[l]ove you Frankie." (T. P. 6/9/14 at p. 92). He also changed his Facebook "status" to read "[p]raying." (*Id.* at p. 93). On the next day, he posted a photo on his Facebook page which depicted Pal with his arm around Bonacci's shoulders, and also included a link for a fundraising effort to raise money to pay for the cost of Bonacci's funeral and burial. (*Id.* at pp. 94-95).

Pal actually attended Bonacci's wake service that was conducted on the evening prior to his funeral. During that public viewing, Bonacci's mother asked Pal what happened to Bonacci, and he replied "I don't know," he "said he was going home." (T. P. 6/3/14 at p. 115). Bonacci's mother inquired whether Bonacci was "drunk" at the time, but Pal stated that Bonacci "was fine." (*Id.* at p. 116). Pal further advised Bonacci's mother at that service that Bonacci stated that he was "going home to shower and go to work at 8:00 AM." (*Id.*).

On August 1, 2013, Maribeth Castaldi received a phone call from an unknown phone number, and when she called that number afterwards, no one answered. (T. P. 6/3/14 at pp. 244-245). Ms. Castaldi contacted Pal and informed him of that missed phone call, and Pal stated that "it was probably the police" because Ms. Castaldi had attended the party at Pal's home on July 19, 2013. (*Id.* at pp. 246-247). Pal falsely instructed Ms. Castaldi that Pal had "called [her] in the morning to pick Sean [Baress] up," but that Ms. Castaldi told Pal "that [she] couldn't because

[she] had work" that morning. (*Id.* at pp. 247-248, 267).

## (G) PAL'S ARREST

On August 1, 2013, Pal was interviewed by detective James Pappas of the Scranton Police Department. (T. P. 6/11/14 at pp. 38, 57-64). At the outset of the interview, Pal stated that he was "upset" because there was "a cloud of suspicion over [him]" and when "he went through the receiving line" at Bonacci's wake, "he got the cold shoulder from Frankie's grandmother." (*Id.* at p. 66). Pal asked detective Pappas what the police had discovered about Bonacci's death, and said that he "heard [Bonacci] was beaten" and "also heard he was stabbed and burned and dumped in the passenger seat of his vehicle." (*Id.* at pp. 66-67).

Pal acknowledged that Dominick and Bonacci had experienced problems in the past concerning Keri Tucker, but claimed that the Dominick — Bonacci fight on June 8, 2013, never occurred because Pal "responded and broke it up" and "diffused the entire situation." (*Id.* at pp. 70-71). Pal informed the detectives that he had offered to drive Bonacci and Dominick home on the morning of July 20, 2013, since Bonacci "was intoxicated and [Pal] was worried about him getting home safely," but that when they arrived at Bonacci's vehicle, Bonacci said that he didn't "have time to drive around or go other places" and had "to get to work." (*Id.* at pp. 76-78). Pal claimed that he and Dominick "then went behind [Pal's] garage and walked through a couple back yards out to Prescott Avenue, then up to Linden" Street and "into the front door of [Pal's] home." (*Id.* at p. 78). Detective Pappas informed Pal that his walking route explanation did not "make any sense," and said that "[t]he only reason [Pal] would tell [Pappas] that is to explain away why Brandon Emily never s[aw]

[Pal] come back." (*Id.* at pp. 82-83).

After Pal repeatedly denied that he had called anyone from his cell phone on the morning of Bonacci's murder, Detective Pappas "propped this poster board blow up of [Pal's] cell phone records on the [interview] table." (*Id.* at p. 88). Upon seeing the chronology of his cell phone exchanges with Maribeth Castaldi, Pal "basically froze" and at first displayed "the stereotypical deer in the headlights syndrome." (*Id.* at pp. 88-89). Pal's original "very confident" and "matter of fact" demeanor immediately changed, and he started "sweating" profusely with "sweat coming off his forehead," "swallowing heavily and breathing deeply." (*Id.* at p. 89).

Pal initially claimed that he "called Maribeth [Castaldi] because her boyfriend, Sean [Baress] needed a ride home." (*Id.*). But detective Pappas advised Pal that Ms. Castaldi was "in the very next room...telling the whole story," including Pal's instruction to "her to say [she] only called [Pal] to pick up Sean [Baress]." (*Id.* at pp. 89, 91). Upon being advised of that fact, Pal "put his head in his hands on the table" and continued to take "deep breaths." (*Id.* at pp. 89-90).

Detective Pappas then confronted Pal with the "video from the University of Scranton" depicting Bonacci's Jeep approaching the Step Fall access road at 6:51 AM, and Pal "leaned back in his chair," "stared at the table," and "remained silent for about five minutes." (*Id.* at pp. 92-93). As Pal began "welling up with tears as he slouched in his chair," detective Pappas showed Pal the "crime scene photographs" of "Frank Bonacci's body" and "vehicle at the scene." (*Id.* at pp. 94-95). Detective Pappas implored Pal "to be honest," to "ask for forgiveness" and to "take responsibility for it." (*Id.* at p. 96).

In an effort to persuade Pal to cooperate, detective Pappas informed Pal that "we know you were there," but suggested that "[m]aybe [Pal] didn't know it was going to happen" or "only thought that it was going to be a fight." (*Id.* at p. 97). Detective Pappas also stated that "maybe it was something you were unaware of until you arrived at or near the scene," and appealed to Pal that "now's the time to take responsibility" and "tell us what happened." (*Id.* at pp. 97-98). However, Pal simply responded "you already know what happened," "[y]ou don't need me to tell you," and "I know you have a solid case." (*Id.* at pp. 98-99). At that point, the interview was terminated and Pal was placed under arrest. (*Id.* at p. 99).

## (H) FORENSIC EVIDENCE

Following the arrests of Pal and Dominick, the police secured search warrants for Pal's garage and seized numerous discharged bullets, as well as the burnt remnants of the clothing worn by Pal and Dominick on the morning of July 20, 2013, which they had torched in Pal's garage immediately following Bonacci's murder. (T. P. 6/9/14 at p. 115; T. P. 6/10/14 at pp. 195-196, 240-241). As mentioned above, a wad cutter bullet from a .38 or .357 caliber handgun was removed from Bonacci's upper cervical spine during his autopsy. (T. P. 6/10/14 at pp. 37-38, 41, 44, 84; T. P. 6/11/14 at pp. 27-28, 35, 41-42). Ten wad cutter bullet projectiles, which had been fired into the wall of Pal's garage, and the wad cutter bullet retrieved from Bonacci's spine were examined by Corporal Elwood Spencer who is a firearm and tool mark examiner with the Pennsylvania State Police Regional Crime Laboratory. (T. P. 6/10/14 at pp. 194, 250-252). Utilizing a calibrated micrometer, Cpl. Spencer compared the fatal, mutilated wad cutter bullet with the ten discharged projectiles seized

from Pal's garage, and concluded that the size, width and number of the lands and grooves, as well as the number and alignment of the cannelures, were the same for the compared bullets. (T. P. 6/11/14 at pp. 8-9,11-13,17, 19). Cpl. Spencer further opined that the firearm which discharged the fatal bullet and the analyzed projectiles from Pal's garage had the "same interior rifling specifications." (*Id.* at p. 23). However, since the police never recovered the handgun that was used to shoot Bonacci, Cpl. Spencer was not "able to go further" and "do a comparison from the knowns," i.e., by comparing "bullets discharged out of the gun" that was used to kill Bonacci with "the one from [Bonacci's] head and the ten from the garage." (*Id.* at pp. 23-24).

## (I) TRIAL PROCEEDINGS

The Commonwealth joined the prosecutions of Pal and Dominick for a consolidated trial pursuant to Pa.R.Crim.P. 582(A)(2), and Pal twice filed motions for severance under Pa.R.Crim.P. 583. Pal's first severance request was denied due to his failure to demonstrate irreconcilably antagonistic defenses by Pal and Dominick, *see Com. v. Pal*, 2014 WL 1042276, at * 12 (Lacka. Co. 2014), and his second motion to sever predicated upon *Bruton v. United States*, 391 U.S. 123 (1968) was also denied based upon the prosecution's agreement to omit any express or implied reference to Pal in a jailhouse informant's testimony against Dominick. *See Com. v. Pal*, 2014 WL 1577521, at *9-10 (Lacka. Co. 2014). However, following "Dominick's 11th hour disclosure of the 'prior bad acts' evidence" he intended "to introduce in an effort to show that Bonacci's murder was committed by someone else," which evidence was clearly "inadmissible in Pal's prosecution," the joint trials were severed for separate trials with the first trial commencing

on April 28, 2014, and the second trial beginning on June 2, 2014.[2] *Com. v. Pal*, 2014 WL 1978623, at *3 (Lacka. Co. 2014). The Commonwealth opted to try Dominick first, and on May 10, 2014, Dominick was found not guilty of first-degree murder and conspiracy to commit first-degree murder, but guilty of third-degree murder and conspiracy to commit third-degree murder. *Com. v. Dominick*, 2014 WL 6850376, at *7 (Lacka. Co. 2014).

Pal testified during his trial and claimed that Dominick told him in the early morning hours of July 20, 2013, that he was "going to fight Frankie" Bonacci. (T. P. 6/11/14 at p. 214). Pal asserted that when he informed Sam Senuk that morning that "someone is messing with Frankie," he was merely referring to Dominick's stated intention to fight Bonacci. (*Id.* at p. 217). Pal contended that he only drove Bonacci and Dominick to Step Falls because he thought that they would fight there, and claimed that he was shocked when Dominick shot Bonacci in the head. (*Id.* at pp. 223-224, 227-231). He also alleged that he did not report the murder to the police because Dominick had supposedly promised to "turn [him]self in," but had requested an opportunity to first spend some "time with [his] sisters" before doing so. (*Id.* at pp. 231-232).

In light of Pal's claim during his testimony that he believed that Dominick merely intended to fight Bonacci, the jury was instructed and furnished a verdict question on the offense of involuntary manslaughter, in addition to the

___

2. A factor which militates against granting a motion for severance under Rule 583 is the concern that separate trials have the effect of "randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand." *Com. v. Travers*, 564 Pa. 362, 365, 768 A.2d 845, 847 (2001) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). To minimize the prospect of providing such an unfair advantage to the second tried defendant, the severed trials were scheduled five weeks apart.

charges for first-degree murder and third-degree murder. (T. P. 6/12/14 at pp. 4-7, 72-74). After approximately ninety minutes of deliberations, (*Id.* at pp. 200-201), the jury found Pal guilty of first-degree murder and conspiracy to commit first-degree murder. (*Id.* at pp. 202-203). Pal exercised his right to a presentence investigation ("PSI"), (*Id.* at pp. 205-206), and after the PSI report was completed, Pal was sentenced on September 5, 2014, to life in prison for his first-degree murder conviction, plus an additional twenty years to forty years incarceration for his conspiracy conviction, payment of costs of prosecution, restitution in the amount of $4,846.85, and submission to a mental health evaluation. (T. P. 9/5/14 at pp. 15-17).

On September 11, 2014, Pal filed his original post-sentence motion, (Docket entry no. 92), and after securing leave of court to file a supplemental post-sentence motion, (Docket entry no. 94), submitted a supplemental post-sentence motion on September 30, 2014. (Docket entry no. 98). In his post-sentence motions, Pal seeks the following forms of relief: (1) a judgment of acquittal or an arrest of judgment under Pa.R.Crim.P. 720(B)(1)(a)(ii)-(iii) due to the alleged insufficiency of the evidence, (Docket entry no. 92 at ¶20); (2) molding of the first-degree murder verdict to third-degree murder based upon the conviction of Dominick for third-degree murder, (Docket entry no. 92 at ¶¶22-29; Docket entry no. 98 at ¶¶ 1-10); and (3) a new trial under Pa.R.Crim.P. 720(B)(1)(a)(iv) on the grounds that (a) the verdict was against the weight of the evidence, (Docket entry no. 92 at ¶21), (b) a change of venue should have been granted, (*Id.* at ¶¶30-40), (c) each member of the venire should have been subjected to individual voir dire, (*Id.* at ¶¶ 41-47), and (d) evidence of Pal's prior "bad acts" was erroneously admitted in contravention of Pa.R.E. 404(b). (Docket entry no. 98 at

¶¶ 11-22). The parties have submitted their supporting and opposing memoranda of law, (Docket entry nos. 101, 103), and following the completion of oral argument on November 26, 2014, Pal's post-sentence motions became ripe for disposition.

## II. DISCUSSION

### (A) SUFFICIENCY OF THE EVIDENCE

Pal first seeks a judgment of acquittal or an arrest of judgment on the basis that the trial evidence was insufficient as a matter of law to sustain the jury's findings of guilt for first-degree murder as an accomplice and criminal conspiracy to commit that offense. "The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Com. v. Buford*, 101 A.3d 1182, 1185-1186 (Pa. Super. 2014). In applying that test, "we may not weigh the evidence and substitute our judgment for the fact-finder." *Com. v. Harden*, 101 A.3d 107, 111 (Pa. Super. 2014).

When conducting a sufficiency of the evidence analysis, we must remain mindful "that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Com. v. Melvin*, 103 A.3d 1, 40 (Pa. Super. 2014). "The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence, and the jury, in passing upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence." *Com. v. Arrington*, 86 A.3d 831, 840 (Pa. 2014), *cert. denied*, 135 S.Ct. 479 (U.S. 2014). "Any doubts regarding a defendant's guilt may be

resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Com. v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014).

"To sustain [Pal's] conviction of first-degree murder, we must conclude that the evidence proved beyond a reasonable doubt the three elements of first-degree murder: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." *Com. v. Martin*, 101 A.3d 706, 718 (Pa. 2014). "A defendant may be convicted of first-degree murder on a theory of accomplice liability so long as the facts support the conclusion that the defendant aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intent to promote or commit the offense, i.e., the intentional killing." *Com. v. Pagan*, 597 Pa. 69, 83, 950 A.2d 270, 279 (2008), *cert. denied*, 555 U.S. 1198 (2009). The Commonwealth "must prove that the defendant 'possessed the requisite specific intent to kill, even if the jury determined that he was not the person who actually pulled the trigger.'" *Com. v. Murray*, 83 A.3d 137, 151 (Pa. 2013) (quoting *Com. v. Johnson*, 572 Pa. 283, 815 A.2d 563, 580 (2002)).

The specific intent and malice required for first-degree murder may be established solely through circumstantial evidence. *Arrington*, 86 A.3d at 840. An accused's conduct following a murder, including the destruction or fabrication of incriminating evidence, is admissible to establish consciousness of guilt of murder. *See Com. v. Wholaver*, 588 Pa. 218, 226, 903 A.2d 1178, 1183 (2006), *cert. denied*, 549 U.S. 1171 (2007). "Clearly, evidence of acts to conceal a crime, such as disposing of a victim's

body, are relevant to prove the accused's intent or state of mind." *Com. v. Dollman*, 518 Pa. 86, 91, 541 A.2d 319, 322 (1988). Moreover, false and contradictory statements by an accused to the police are likewise "indicatory of guilt" of murder. *Com. v. Carbone*, 524 Pa. 551, 562, 574 A.2d 585, 589 (1990); *Com. v. Donnelly*, 439 Pa. Super. 70, 75, 653 A.2d 35, 37 (1995), *app. denied*, 541 Pa. 633, 663 A.2d 686 (1995).

Malice requires proof of "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty," and "may be inferred by considering the totality of the circumstances." *Com. v. Thompson*, 2014 WL 6948150, at *9 (Pa. Super. 2014) (quoting *Com. v. Dunphy*, 20 A.3d 1215, 1219 (Pa. Super. 2011)). "Actions of the accused that occur before, during *and* after are admissible as evidence to show malice." *Com. v. Gonzalez*, 858 A.2d 1219, 1223 (Pa. Super. 2004) (emphasis in original), *app. denied*, 582 Pa. 695, 871 A.2d 189 (2005). "Further, actions that attempt to conceal a crime or destroy evidence are also admissible to prove malice." *Id.*

A defendant cannot be convicted as an accomplice simply based on evidence of the defendant's knowledge of the crime or presence at the crime scene, *Com. v. Gross*, 101 A.3d 28, 35 (Pa. 2014), and "[t]here must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid." *Com. v. Rega*, 593 Pa. 659, 690, 933 A.2d 997, 1015 (2007), *cert. denied*, 552 U.S. 1316 (2008). However, "[t]he amount of aid 'need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime.'" *Com. v. Markman*, 591 Pa. 249, 269-270, 916

A.2d 586, 597-598 (2007) (quoting *Com. v. Murphy*, 577 Pa. 275, 286, 844 A.2d 1228, 1234 (2004)). "The least degree of assistance in committing the offense is adequate to sustain the finding of responsibility as an accomplice." *Com. v. Adams*, 39 A.3d 310, 324 (Pa. Super. 2012), *aff'd*, 2014 WL 6491642 (Pa. 2014).

"To establish conspiracy to commit murder, the Commonwealth must show that the defendant, with the specific intent to kill, agreed with one or more persons to commit murder, or agreed to attempt to commit murder, or solicited someone to commit such crime or agreed to aid in the commission, attempt, or solicitation of such crime, and committed an overt act towards the commission of the murder." *Com. v. Stokes*, 38 A.3d 846, 855 (Pa. Super. 2011). "In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." *Com. v. Sanchez*, 82 A.3d 943, 973 (Pa. 2013), *cert. denied*, 135 S.Ct. 154 (U.S. 2014). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." *Com. v. Watley*, 81 A.3d 108, 116 (Pa. Super. 2013), *app. denied*, 95 A.3d 277 (Pa. 2014). "Additionally, each member of a conspiracy to commit homicide may be convicted of first-degree murder, regardless of who inflicted the fatal wound." *Com. v. Patterson*, 91 A.3d 55, 66 (Pa. 2014).

In challenging the sufficiency of the evidence underlying his first-degree murder and conspiracy convictions, Pal contends that the Commonwealth's case was premised solely upon his "presence at the scene of the crime" and

his failure to "disclose the murder to the police." (Docket entry no. 101 at p. 6). Pal posits "that mere presence at the scene of the crime, even a horrific shooting as this, without more, does not establish guilt beyond a reasonable doubt, including the criminal intent to commit a crime, let alone the specific intent to kill." (*Id.* at pp. 14-15). Pal further argues that "[a] citizen has no affirmative duty to report a crime to the police and, as a matter of law, it is not a crime to fail to report a crime." (*Id.* at p. 18) (citing *Com. v. Gettemy*, 591 A.2d 320, 323 (Pa. Super. 1991)).

Pal submits that "[t]here was absolutely no motive for him to have killed [Bonacci] or to have conspired with [Dominick] to kill him as he was very good friends with both." (*Id.* at p 21). He also maintains that "the ballistics evidence exonerated Mr. Pal of any involvement in the murder," and that "there was no other forensic evidence buttressing the Commonwealth's case against Mr. Pal." (*Id.* at pp. 24, 25). Based upon that reasoning, Pal asserts that the "judgment must be arrested or an acquittal entered" in this case. (*Id.* at p. 206).

The Commonwealth counters that Pal's "actions before the murder, during its commission, and during the week following the murder are all circumstantial evidence of [Pal's] active participation in the murder of Mr. Bonacci and [Pal's] specific intent to kill." (Docket entry no. 103 at p. 24). The prosecution "agrees that mere presence at the scene of a crime does not establish guilt," but asserts that "the case against [Pal] was built on much more than his presence at the scene." (*Id.* at p. 18). For instance, Pal had "knowledge of the deep history of animosity between Dominick and Bonacci stemming from their relationship with Keri Tucker," and in the month before the murder, "was attempting to persuade Bonacci to come to fight in

the 'Step Falls' area where his body was found six weeks later." (*Id.* at pp. 18-19). The Commonwealth notes that in furnishing a ride to Bonacci, Pal "walked right past [Pal's] own vehicle that was parked in his driveway and got into the driver's seat of Bonacci's vehicle," and further argues "that Pal drove a likely unconscious Bonacci three-quarters of a mile down the secluded road not for a fight, but for a murder." (*Id.* at p. 20). The Commonwealth maintains that Pal "chose to drive Bonacci's vehicle instead of his own into the woods, where turning around to exit would be nearly impossible, because he had no intention of leaving with Bonacci or his vehicle." (*Id.* at p. 21).

The Commonwealth also maintains that it would have been impossible for a single person to "[p]lac[e] a fifty-pound boulder on the gas pedal of a vehicle on the edge of a seventy-foot cliff," to "shift[] the Jeep into gear while the gas pedal was fully engaged," and "to not be caught by the Jeep or the open driver's door as it careened over the ravine with the victim." (*Id.* at p. 21). In addition to referencing Pal's actions in contacting his friend Castaldi "to pick both him and Dominick up and take them home" immediately following the murder, the Commonwealth notes that Pal "suggested a falsified story to Ms. Castaldi and her boyfriend, Mr. Baress." (*Id.* at pp. 21-22). In response to Pal's arguments regarding physical evidence, the Commonwealth argues that its ballistics expert "concluded that the bullets from [Pal's] garage and the bullet from Bonacci were shot from a gun with the same internal rifling characteristics." (*Id.* at p. 22). Last, the Commonwealth states that Pal's post-murder phone calls, text messages and Facebook postings to Bonacci are "strong circumstantial evidence of [Pal's] consciousness of guilt" and his "attempt to deflect attention from himself as a participant in the murder of Bonacci." (*Id.* at pp. 23-

24).

Examining the trial record in the light most favorable to the Commonwealth as the verdict winner, the direct and circumstantial evidence sufficiently established Pal's guilt of first-degree murder as an accomplice and criminal conspiracy to commit that offense. Pal and Dominick were "best friends" since childhood, with Pal operating as the "leader" and Dominick as the "follower" in their relationship. Pal was well aware of the animus between Dominick and Bonacci, Dominick's past effort to physically beat Bonacci, and his texted threat to "snuff him." As evidenced by Dominick's bizarre text messages to Keri Tucker within twenty-four hours of Bonacci's murder, Dominick was unraveling emotionally and psychologically because of his obsession with Ms. Tucker. Only Dominick's close friend, Pal, was known to own or possess wad cutter bullets and handguns, including an unregistered .38 caliber handgun that Pal acquired from Cameron Kashmer and which has never been located.

A heavily intoxicated Bonacci was last seen alive in Pal's company as they walked past Pal's own vehicle to Bonacci's Jeep after Pal had arranged to isolate Bonacci in the company of Pal and Dominick. Pal provided the transportation to the secluded murder site, as documented by the University of Scranton surveillance videotape depicting Bonacci's Jeep approaching the Step Falls access road. Twenty-seven minutes later, Pal began contacting Maribeth Castaldi for a ride, and she retrieved Pal and Dominick in close proximity to Step Falls. The wad cutter bullet removed from Bonacci's head had the same lands and grooves measurements and cannelures characteristics as the discharged wad cutter projectiles discovered in Pal's garage. As the Commonwealth aptly

notes, it would have been physically impossible for one person to place the fifty pound boulder on the accelerator of Bonacci's vehicle and to shift the Jeep into gear while it was fully engaged, without being trapped in the rapidly descending Jeep or otherwise seriously injured. Finally, at the conclusion of his interrogation by detective Pappas, Pal admitted that the investigators had "a solid case" and "know what happened."

Pal's post-murder actions designed to deflect attention from him and to conceal the commission of the murder provide further evidence of his intent and state of mind. Immediately following the bloody murder of a purported close friend, Pal acted perfectly normal, tickled Sean Baress to awaken him, enjoyed a breakfast with friends, and even flirted with their waitress. Knowing full well that Bonacci was dead, Pal placed calls to Bonacci's cell phone, and posted non-private messages on Bonacci's Facebook wall inquiring as to his whereabouts. In his statements, text messages and social media communications with family and friends of Bonacci, Pal feigned ignorance of Bonacci's condition or location and acted as though Bonacci was still alive. Pal attempted to perpetuate that ruse by attending Bonacci's wake and participating in search parties for him.

Other post-murder conduct by Pal furnished strong evidence of his consciousness of guilt. Pal repeatedly lied to the police and Bonacci's family and friends regarding the actions of Pal, Dominick and Bonacci on the morning of July 20, 2013. Pal also encouraged Maribeth Castaldi and Sean Baress to provide false information to law enforcement authorities. In addition, he destroyed incriminating evidence by disposing of Bonacci's body and burning his own clothing that he wore at the time of

the murder.

Among the most compelling evidence of Pal's guilt was his cold and emotionless demeanor during his trial testimony as he robotically described the horrific details of the murder of Bonacci. During his closing argument, the prosecutor referenced the "cold hearted and callous" manner in which Pal graphically recounted the killing of Bonacci. (T. P. 6/12/14 at pp. 130, 181-182, 184-186). At the time of Pal's sentencing, the undersigned advised Pal that he had never "witnessed somebody speak and act in such a cold and dispassionate and apathetic manner as Mr. Pal did when he described the gruesome details of a murder of somebody who was supposed to be his friend." (T. P. 9/5/14 at p. 15). The jury was free to consider Pal's demeanor in that regard when deciding his guilt. *See Com. v. Alicia*, 92 A.3d 753, 761 (Pa. 2014) (veracity of witnesses must be decided based upon common knowledge of the natural tendencies of human nature, and observations of the demeanor of witnesses, such that the phenomenon of lying is within the ordinary capacity of jurors to assess).

Pal's actions before, during and after the murder of Bonacci were sufficient to establish that Pal aided Dominick in the murder of Bonacci by isolating Bonacci alone with them, providing the transportation to the murder site, and furnishing Dominick with the gun and bullet used to kill Bonacci. Sufficient evidence also demonstrated that Pal conspired with Dominick to murder Bonacci and committed the foregoing overt acts in furtherance of that conspiracy. The evidence presented by the Commonwealth adequately proved that Pal aided and conspired with Dominick, and did so with malice and the specific intent to kill.

The totality of the direct and circumstantial

evidence, when viewed in the light most favorable to the Commonwealth, was sufficient to prove beyond a reasonable doubt the elements of first-degree murder as an accomplice and conspiracy to commit first-degree murder. As a result, Pal's motion for a judgment of acquittal or an arrest of judgment due to the alleged insufficiency of the evidence will be denied.

(B) MOLDING OF FIRST-DEGREE MURDER CONVICTION TO THIRD-DEGREE MURDER CONVICTION

Pal next seeks to have his first-degree murder conviction vacated, the jury verdict molded "from first-degree to third-degree murder," and "a new sentencing hearing" conducted on a third-degree murder finding. (Docket entry no. 101 at p. 30). Following Dominick's acquittal of first-degree murder and criminal conspiracy to commit first-degree murder, Pal filed a pre-trial motion on May 23, 2014, seeking to dismiss the charges against him for first-degree murder and conspiracy to commit first-degree murder. (Docket entry no. 66 at p. 2). Pal relied upon the Common Pleas decision in *Com. v. Ricci*, 89 Pa. D. & C. 187 (Montg. Co. 1954) as authority for his argument that the Commonwealth was collaterally estopped from seeking to convict Pal of first-degree murder. (*Id.* at ¶¶ 10-12).

In denying Pal's motion, we reasoned that his argument was "directly contrary to the clear language of Section 306 of the Pennsylvania Crimes Code governing accomplice liability," which "expressly states that '[a]n accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense...has been convicted of a different offense or degree of offense...or

has been acquitted.'" *Com. v. Pal*, 2014 WL 2192398, at
*3 (Lacka. Co. 2014) (quoting 18 Pa.C.S.A. § 306(g)).
We also referenced appellate precedent holding "that a
judgment of acquittal of one criminal defendant does not
prevent the relitigation of an issue or controversy in the
prosecution of another criminal defendant, even though
the same transaction is involved," and "that the acquittal
of a defendant's sole alleged co-conspirator does not
preclude the prosecution and conviction of that defendant
on a conspiracy charge." *Id.* (quoting *Com. v. Brown*, 473
Pa. 358, 464, 375 A.2d 331, 334-335 (1977) and *Com. v.
Fremd*, 860 A.2d 515, 521 (Pa. Super. 2004), *app. denied*,
586 Pa. 708, 889 A.2d 1213 (2005)). Furthermore, we
concluded that Pal's reliance upon *Ricci* was misplaced
since "[t]he lower court holding in *Ricci* was issued prior
to the 1973 enactment of the above-quoted provision in
Section 306(g) of the Crimes Code, 18 Pa.C.S.A., and the
Supreme Court interpretation of that statutory language in
*Brown*." *Id.* at n.3.

In his post-trial motion, Pal alleges that his first-degree
murder conviction "must be molded to third degree, as a
matter of fundamental fairness under the state and federal
due process clauses because Mr. Dominick, the actual
shooter of the victim, was convicted of third-degree murder
and an alleged accomplice cannot be found guilty of a
higher-degree of homicide under an accomplice liability
theory." (Docket entry no. 101 at p. 26). Pal advances
the same argument that was rejected in our order of May
23, 2014, but also asserts that 18 Pa.C.S.A. § 306(g)
"must be struck down as constitutionally infirm under the
Pennsylvania and United States Constitution." (*Id.* at p.
28). Besides the Montgomery County court decision in
*Ricci*, the only authority cited by Pal is the 1915 holding
in *Com. v. Minnich*, 250 Pa. 363, 95 A.565 (1915), in

which the Supreme Court stated that "[t]here can be no conviction of one charged as an accessory except the guilt of the principal be first established." *Id.* at 365, 95 A. at 566.

The Commonwealth replies that Pal baldly "claims that 18 Pa.C.S.A. § 306(g) is unconstitutional pursuant to the due process clause in the Pennsylvania and United States Constitutions," but "fails to further elaborate on what aspect of his due process rights were violated and provides no legal support for his unsubstantiated contention that any due process rights were violated." (Docket entry no. 103 at p. 25). The Commonwealth submits that *Minnich* is "factually dissimilar to [Pal's] prosecution and conviction in that this matter," was "decided prior to the enactment of Section 306(g)," and is "contrary to later opinions issued by the United States Supreme Court, the Supreme Court of Pennsylvania and the Superior Court of Pennsylvania." (*Id.* at p. 31).

Pennsylvania's accomplice liability statute, 18 Pa.C.S.A. § 306, has withstood constitutional challenge to its validity. *See, e.g., Com. v. Tavares*, 382 Pa. Super. 317, 323-326, 555 A.2d 199, 202-203 (1989), *app. denied*, 524 Pa. 619, 571 A.2d 382 (1989). Section 306(g) of that statute clearly states that "[a]n accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense...has been convicted of a different offense or degree of offense...or has been acquitted." 18 Pa.C.S.A. § 306(g). The Supreme Court of Pennsylvania has relied upon Section 306(g) in affirming accomplice and conspiracy convictions in homicide cases, even though the principal has either been acquitted or convicted of a lesser offense. *See Com. v. Smith*, 480 Pa. 524, 529, 391

A.2d 1009, 1011 (1978) (upholding first-degree murder conviction of an accomplice, and stating that "the fact that the principal was only convicted of murder in the third degree for the killing of Fisher is of no consequence since the Crimes Code specifically allows that an accomplice may be convicted of a different degree of an offense than the person who actually fired the fatal shots."); *Com. v. Jackson*, 463 Pa. 301, 306, 344 A.2d 842, 844-845 (1975) ("We also cannot accept appellant's argument that his conviction, premised on the existence of a conspiracy, cannot stand where the person who allegedly perpetrated the homicide has been judged not guilty.").

Pal's post-sentence motions and supporting brief do not develop or elucidate his federal and state due process clause attack on 18 Pa.C.S.A. § 306(g). *See Com. v. Kunkle*, 79 A.3d 1173, 1188 (Pa. Super. 2013) ("[I]t was still incumbent upon appellant to develop, substantiate and support her argument," and her "failure to do so results in waiver of her issue...."). In addressing a due process challenge to the federal accomplice liability statute, 18 U.S.C. § 2, the Supreme Court of the United States has concluded that "[n]othing in...the due process clause forecloses putting petitioner on trial as an aider and abettor simply because another jury has determined that his principal was not guilty of the offense charged." *Standefer v. United States*, 447 U.S. 10, 22 n.16 (1980). Pal has not cited any federal or state precedent recognizing any due process infirmity in 18 Pa.C.S.A. § 306(g).

It is well settled in this Commonwealth that inconsistent verdicts are not considered erroneous and do not provide a basis for vacating a conviction. *See Com. v. Moore*, 2014 WL 5485706, at *8 (Pa. 2014) (noting "the long line of cases from both this court and the United States

Supreme Court which unequivocally permit inconsistent jury verdicts and prohibit drawing inferences from a jury's verdict of acquittal."). This is particularly true where the verdicts have been reached by different juries in separate trials. *See Com. v. Campbell*, 539 Pa. 212, 216, 651 A.2d 1096, 1099 (1994) ("The different verdicts could instead be the result of different proof offered at the separate trials or the different composition of the juries."). Pal's conviction of first-degree murder as an accomplice, despite the earlier conviction of Dominick for third-degree murder, is permissible under 18 Pa.C.S.A. § 306(g).[3] *See Smith, supra.* Therefore, Pal's request to have his first-degree murder conviction vacated, and the jury verdict molded to third-degree murder, will be denied.

## (C) WEIGHT OF THE EVIDENCE

Pal alternatively requests a new trial pursuant to Pa.R.Crim.P. 720(B)(1)(a)(iv) on the basis that the guilty verdicts were allegedly against the weight of the evidence. (Docket entry no. 101 at pp. 7-8, 26). "A challenge to the

---

3. Proof of a defendant's "voluntary intoxication" or "drugged condition" may reduce first-degree murder to third-degree murder by negating the element of specific intent. *See Com. v. Fletcher*, 580 Pa. 403, 419, 861 A.2d 898, 907 (2004), *cert. denied*, 541 U.S. 1041 (2006); *Com. v. Street*, 69 A.3d 628, 632 (Pa. Super. 2013). In affirming the sufficiency of the evidence supporting Dominick's third-degree murder conviction, we reasoned:

> The jury was presented with evidence indicating that in the hours preceding the murder, Dominick used the drug "ecstasy" and consumed a considerable amount of alcohol. The jury also viewed text messages reflecting that Dominick had become mentally unhinged on July 19, 2013, and July 20, 2013, as a result of his uncontrollable jealousy and infatuation with Keri Tucker. The jury was free to conclude that Dominick's intoxicated and drugged condition, when coupled with his disintegrating emotional state, negated his capacity to form the specific intent to kill. In that event, the jury was at liberty to find Dominick guilty of third-degree murder rather than first-degree murder.

*Com. v. Dominick*, 2014 WL 6850376, at *18 (Lacka. Co. 2014).

weight of the evidence concedes that there is sufficient evidence to sustain the verdict," as a result of which "the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." *Com. v. Harvard*, 64 A.3d 690, 700 (Pa. Super. 2013), *app. denied*, 621 Pa. 687, 77 A.3d 636 (2013). A new trial may be granted on the basis that the verdict was against the weight of the evidence only if the evidence is "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Com. v. Childs*, 63 A.2d 323, 327 (Pa. Super. 2013), *app. denied*, 620 Pa. 728, 70 A.3d 808 (2013).

Since a jury is free to believe the Commonwealth's witnesses and to disbelieve Pal's testimony. *Com. v. Chine*, 40 A.3d 1239, 1244 (Pa. Super. 2012), *app. denied*, 619 Pa. 685, 63 A.3d 773 (2013), "a new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Com. v. Landis*, 89 A.3d 694, 699 (Pa. Super. 2014) (quoting *Com. v. Rivera*, 603 Pa. 340, 362, 983 A.2d 1211, 1225 (2009)). "A trial judge must do more than reassess the credibility of the witnesses and allege that [s]he would not have assented to the verdict if [s]he were a juror." *Harvard, supra* (quoting *Com. v. Fisher*, 47 A.3d 155, 158 (Pa. Super. 2012), *app. denied*, 619 Pa. 677, 62 A.3d 378 (2013)). "Rather, the role of the trial court is to determine that notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice." *Landis, supra*.

The evidence of Pal's guilt was not so conjectural and equivocal that the jury's guilty verdicts shocked the conscience of the court. The direct and circumstantial evidence discussed in Section II(A) above reflects that Pal

aided Dominick in killing Bonacci, acted with the intent to promote that murder, and conspired with Dominick to kill Bonacci. While it is true that Pal claimed that he believed that Dominick only intended to fight Bonacci, the jury was empowered to disbelieve Pal's testimony and to accept the Commonwealth's evidence. *See, Chine, supra.*

Pal has not established that his account of the fatal shooting was "so clearly of greater weight" that justice will be denied if Pal's version of events is not afforded equal weight as the proof of his guilt. The jurors were free to assess the credibility of the witnesses and to resolve any conflicts in the evidence in their capacity as the finders of fact. Pal simply has not demonstrated that the guilty verdicts were against the weight of the evidence, and for that reason, his motion for a new trial on that basis will be denied.

### (D) CHANGE OF VENUE

Pal also seeks a new trial on the basis that a change of venue should have been granted because the "jury was incapable of fairly and impartially reaching a verdict in this case as a result of the presumptively prejudicial pre-trial publicity." (Docket entry no. 92 at p. 14). "A change of venue becomes necessary when the trial court determines that a fair and impartial jury cannot be selected in the county in which the crime occurred." *Com. v. Chmiel*, 612 Pa. 333, 404, 30 A.3d 1111, 1152 (2011) (quoting *Com. v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1092 (1998)). As a general rule, for a defendant to be entitled to a change in venue because of pre-trial publicity, the defendant must show that the publicity caused actual prejudice by preventing the empanelling of an impartial jury. *Com. v. Briggs*, 608 Pa. 430, 466, 12 A.3d 291, 313 (2011), *cert. denied*, 132 S.Ct. 267 (U.S. 2011). However, the mere

existence of pre-trial publicity alone does not constitute actual prejudice. *Com. v. Birdsong*, 611 Pa. 203, 224, 24 A.3d 319, 331 (2011). "Consequently, the pivotal question in determining whether an impartial jury may be selected is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial." *Briggs*, 608 Pa. at 467, 12 A.3d at 314.

There is an exception to the requirement that the defendant demonstrate actual prejudice, and pre-trial publicity will be presumed to have been prejudicial if the defendant is able to prove that the pre-trial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) was derived from official police or prosecutorial reports. *Chmiel, supra*; *Com. v. Tharp*, 574 Pa. 202, 219, 830 A.2d 519, 529 (2003), *cert. denied*, 541 U.S. 1045 (2004). Even if the defendant proves the existence of one or more of these circumstances, a change of venue still is not warranted "unless the defendant also demonstrates that the presumptively prejudicial pre-trial publicity 'was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.'" *Briggs*, 608 Pa. at 468, 12 A.3d at 314 (quoting *Tharp, supra*). In determining whether there has been an adequate "cooling off" period to dissipate the effect of presumptively prejudicial media coverage, "what

prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective." *Id.* at 469, 12 A.3d at 314 (quoting *Com. v. Robinson*, 581 Pa. 154, 195-196, 864 A.2d 460, 484 (2004), *cert. denied*, 546 U.S. 983 (2005)).

(1) Pre-Trial Motion for Change of Venue

Pal filed an omnibus pre-trial motion which included a request "for change of venue," but not for a change of venire. (Docket entry no. 14 at p. 2). In his supporting brief, Pal "ask[ed] that this court consider a change of venue in this matter, but reserve ruling until the completion of voir dire." (*Id.* at p. 15). The only proof of pre-trial publicity that Pal submitted was an exhibit reflecting that *The Times-Tribune* "website has a stationary tab on its main page with news about this case and the investigation surrounding it." (*Id.* at p. 13) (citing Exhibit K). The Commonwealth replied to Pal's pre-trial motion seeking a change of venue by arguing that "the publicity in this case against [Pal] has not been so pervasive, inflammatory or inculpatory as to demand a change of venue, and that the inquiry is best reserved until the process of jury selection has begun." (Docket entry no. 17 at p. 32). In denying Pal's pre-trial request to the extent that it sought an immediate change of venue, we reasoned:

> Any determination as to whether the pre-trial publicity in this case prevents the selection of a fair and impartial jury can only be made based upon the prospective jurors responses during voir dire regarding their exposure to media reports, and their ability to set aside any preliminary opinions that they may have formed and to render a verdict based on the evidence. Therefore, we will deny the defense motion for an immediate change

of venue, without prejudice to Pal's right to renew his request for a change of venue based upon the responses of the venire during selection.

*Com. v. Pal*, 2014 WL 1042276, at *19 (Lacka. Co. 2014).

During jury selection, 98 of 101 members of the venire acknowledged that they had "seen or heard or read...news reports or overheard...conversations or participated in... conversations regarding Frank Bonacci's death or the arrest of the defendant, Neil Pal." (T.P. 6/2/14 at pp. 14-15). Of those 98 individuals, 18 people stated that they could not "set aside" what they "ha[d] heard, seen or read and...decide the charges...based on the evidence presented during the trial and the instructions...on the law."[4] (*Id.* at pp. 16-19). The prospective jurors were also asked about their exposure to "social media," such as "Facebook, Twitter

---

4. The jurors were instructed "that verdicts in cases must be based upon evidence that meets certain standards for quality and reliability," and that "news reports and every day conversations aren't subject to those same evidentiary requirements." (T.P. 6/2/14 at pp. 9-10, 12). The venire was advised, for example, that: (1) trial witnesses must "take an oath to testify truthfully" and are "subject to prosecution for perjury" if they testify untruthfully; (2) trial witnesses are "subject to direct examination by the party who calls that witness, as well as to cross-examination by counsel for the other party;" (3) generally, "hearsay evidence" is not permitted and, instead, the person who allegedly made a statement usually must "come into court, swear under oath to testify truthfully and subject to perjury," and "then testify from the witness stand;" and (4) "jurors are provided with arguments and evidence that may be submitted by both sides of the case before the jury then retires to deliberate and reach a verdict." (*Id.* at pp. 10-11). The prospective jurors were further informed that "those same safeguards...don't apply to our every day conversations that we may have or to news reports," which "may be based upon anonymous sources or people who decline to be identified" or "upon only one party's version of events." (*Id.* at pp. 11-12). Moreover, the venire members were reminded that "even when the source is identified in a conversation or a news report, that source has not provided information only after being placed under oath and subject to perjury before that person makes whatever statement he or she may have made." (*Id.*). The potential jurors were admonished "that the law demands that verdicts in cases be based on testimony where witnesses have greater accountability for what they say during the course of their testimony." (*Id.* at 12).

[and] Instagram," and four additional venirepersons stated that they had formed fixed opinions regarding Pal's "guilt or innocence" based upon what they "heard, read, saw or talked about on social media in relation to this case." (*Id.* at pp. 149-151). All 22 individuals who indicated that they had formed such opinions, or could not set aside what they had seen, read or heard, were stricken for cause. (*Id.* at pp. 111-112, 115-117, 119-123, 134-135, 158).

Following collective questioning of the venire by the court, the prosecutor, and Pal's counsel, certain members of the jury panel were subject to individual voir dire. (*Id.* at pp. 9-110, 140-173). In addition to the foregoing 22 people who were stricken for cause due to their inability to set aside news reports, social media or conversations regarding the case, 36 other members of the venire were removed for separate "cause" reasons. (*Id.* at pp. 110-111, 113-124, 127-128, 134-135, 144, 155-156, 158, 174-178). Thus, in total, 58 prospective jurors were stricken for cause.

A jury comprised of twelve principal jurors and four alternate jurors was selected by counsel without exhausting all members of the venire. (*Id.* at pp. 189-190). After the jury was selected, Pal was afforded the opportunity to renew his motion for a change of venue. (*Id.* at pp. 195-196). Finding that the media reports were "factual and objective," rather than "sensational, inflammatory and slanted toward conviction," we denied the defense motion based upon the absence of any "actual prejudice in the empanelling of the jury," as evidenced by "the fact that [the parties] were able to have more than sufficient jurors remaining from the panel even after all of the strikes for cause and the peremptory challenges" were exercised. (*Id.* at pp. 194-195, 198).

Once the jury was selected and before the jurors were excused for the day, they were admonished "not to pay attention" to any news reports or social media concerning the case or to engage in any face-to-face conversation or digital communication with anyone about the case. (*Id.* at pp. 191-192). Unfortunately, a principal juror and an alternate juror posted comments on Facebook about their selection as jurors, and they were promptly dismissed from their jury service. (T. P. 6/4/14 at pp. 4-7). To ensure that the remaining jurors were not exposed to any news reports or out-of-court communications during the trial and their deliberations, the jurors were questioned each day at the outset of the proceedings as to whether they had seen, read or heard any news reports, or viewed, overheard or engaged in any face-to-face or digital communication relating in any manner to this case. (T. P. 6/3/14 at p. 4; T. P. 6/4/14 at pp. 4-5; T. P. 6/5/14 at p. 3; T. P. 6/9/14 at pp. 5-6; T. P. 6/10/14 at pp. 4-5; T. P. 6/11/14 at p. 3; T. P. 6/12/14 at pp. 8-9). Based upon their responses, none of the jurors who decided Pal's fate were exposed to any media reports or other extraneous information. (*Id.*).

Pal's post-sentence motion renews his pre-trial change of venue argument, and "requests that he be granted a new trial because his jury was incapable of fairly and impartially reaching a verdict in this case as a result of the presumptively prejudicial pre-trial publicity." (Docket entry no. 101 at p. 41). Pal contends that the pre-trial publicity was presumptively prejudicial since the news coverage "was sensational, inflammatory, and slanted toward conviction as opposed to being factual and objective."[5] (*Id.* at pp. 39-40). The Commonwealth

---

5. Pal's brief originally alleged that the news coverage "referred to certain admissions allegedly made by Mr. Pal" and "was derived from official police or prosecutorial reports." (Docket entry no. 101 at p. 40).

responds that Pal "has failed to show that the pre-trial media reports were conviction-slanted, inflammatory and unfairly prejudicial," and submits that since those members of the venire who could not set aside news reports or social media information were removed for cause, "it is clear that despite media coverage of Mr. Bonacci's murder, selecting a fair and impartial jury was able to be accomplished." (Docket entry no. 103 at pp. 34, 39-40).

(2) Conventional News Coverage

In support of his post-trial change of venue argument, Pal has submitted a two volume appendix containing copies of news media articles regarding the murder of Bonacci, the arrests of Pal and Dominick, the pre-trial proceedings and rulings, and the trials of Dominick and Pal. Of the 268 pages contained in both volumes, 87 pages are duplicates of the same news reports, 65 pages concern news reports which post-date the start of Pal's trial on June 2, 2014, and 5 pages are postings or links from the website, "Frankie's Voice." (Docket entry nos. 99-100). Hence, only 111 pages of the two volume exhibit relate to pre-trial news coverage.

A request for a change of venue based upon the claimed existence of pre-trial publicity prejudicial to the defendant's right to trial before an impartial jury is addressed to the sound discretion of the trial court whose decision will not be disturbed absent an abuse of discretion. *Chmiel*, 612 Pa. at 403-404, 30 A.3d at 1152. The Supreme Court has

Neither Pal's post-sentence motion, nor his supporting brief, identify any news articles which purportedly referenced admissions by Pal or information gleaned from official police or prosecutorial reports, and at the time of oral argument, the only "presumptively prejudicial" contention advanced by Pal was the argument that the pre-trial publicity was sensational, inflammatory, and slanted toward conviction. (T. P. 11/26/14 at pp. 7-8, 10-16, 20-24, 32-36).

"recognized that 'the trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change.'" *Briggs*, 608 Pa. at 466, 12 A.3d at 313 (quoting *Tharp*, 574 Pa. at 219, 830 A.2d at 529). "In reviewing the trial court decision not to grant a change of venue, the focus of our inquiry is to determine whether any juror formed a fixed opinion of the defendant's guilt or innocence due to the pre-trial publicity." *Id.* (citing *Com. v. Drumheller*, 570 Pa. 117, 132, 808 A.2d 893, 902 (2002)).

Pal has not demonstrated that the pre-trial news reports caused actual prejudice by preventing the impaneling of an impartial jury, nor has he established that the media coverage was presumptively prejudicial since it was sensational, inflammatory, and slanted toward conviction. The pre-trial news articles submitted for review constitute factual and objective reports of Bonacci's disappearance and murder, the arrests of Dominick and Pal, the pre-trial proceedings and rulings, and Dominick's trial. Since the conventional news reports were not presumptively prejudicial, a change of venue was not warranted in this case.[6]

Even if the conventional media coverage was somehow found to be presumptively prejudicial, Pal would not be entitled to a change of venue unless he

---

[6]. Pal's post-trial appendix also includes news coverage relating to Pal's trial, and the Commonwealth has filed a motion to strike that portion of the appendix on the ground that those reports cannot be considered "pre-trial" publicity. (Docket entry no. 201). Since the jurors were admonished to ignore all conventional and social media reports during the trial, and were questioned each day of the trial to ensure that they had not been exposed to any such reports, the appendix materials relating to news coverage of Pal's trial are of no consequence. Moreover, the news articles concerning Pal's trial are likewise factual and objective, and cannot be characterized as presumptively prejudicial.

further established that the presumptively prejudicial publicity was so pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time for the prejudice to have dissipated. *See Briggs*, 608 Pa. at 468, 12 A.3d at 314. The prospective jurors' responses during voir dire are the most "reliable guide[s]" in determining whether (a) there has been an adequate "cooling off period to dissipate the impact of presumptively prejudicial publicity, or (b) "the publicity is still so fresh in their minds that it has removed their ability to be objective." *Id.* at 469, 12 A.3d at 314.

Less than 22% of the jury panel stated that as a result of the conventional and social media publicity, they had formed fixed opinions about Pal's guilt or could not otherwise set aside that pre-trial publicity. *See Tharp*, 574 Pa. at 219, 830 A.2d at 529 (holding that no change of venue was required when only 30% of the prospective jurors stated they had a fixed opinion of defendant's guilt and were excused for cause); *Com. v. Stoltzfus*, 462 Pa. 43, 54, 337 A.2d 873, 878 (1975) (finding no change of venue necessary when 22% of the venire had formed fixed opinions of defendant's guilt). Furthermore, "[a]ll of the jurors seated avowed under oath and penalty of perjury that they could decide the case based solely on the trial evidence, and that they had no preconceived or fixed opinion of [defendant's] guilt." *Briggs*, 608 Pa. at 474, 12 A.3d at 318. Additionally, following their selection as jurors, each juror was "admonished to refrain from reading, viewing or otherwise being attentive to any media reports or other outside information regarding the case and trial," and "on each day of the trial, the jury was directly asked whether any juror had read, seen, or heard any news reports or other outside information regarding the case or trial or had discussions with any persons concerning the case or trial."

*Chmiel*, 612 Pa. at 405-406, 30 A.3d at 1153. Therefore, assuming *arguendo* that the traditional media coverage could be characterized as presumptively prejudicial, a change of venue was nonetheless unwarranted.

(3) Social Media

Pal has also submitted a CD containing social media which he contends should be considered as pre-trial publicity. The social media exhibit is derived from a website, www.frankiesvoice.org, and a Facebook page, www.facebook.com/FrankiesVoice. The website consists of hyperlinks to news stories regarding the disappearance and murder of Bonacci, the pre-trial and trial proceedings for Dominick and Pal, and various community events in Bonacci's memory (e.g., "Vigil Against Violence" on 8/10/13, "Frankie's Voice Bandana 5K Run/Walk on 7/20/14). The Facebook page was created by Courtlind Davis on July 23, 2013, and was originally designed to solicit volunteers for search parties attempting to locate Bonacci following his disappearance. (T. P. 6/9/14 at pp. 265-269, 271-272, 278-284). The postings on the Facebook page are comprised of solicitations for a memorial fund to pay the cost of Bonacci's funeral, notices relating to community events such as blood drives, food donations and fundraisers for seriously ill individuals, links to news stories pertaining to the pre-trial proceedings, trials and sentencings of Pal and Dominick, prayer posts, and missing person alerts for 26 people throughout the country.

Pal asserts that the "Frankie's Voice" website and Facebook page should be considered as "pre-trial publicity," (T. P. 11/26/14 at pp. 13-14), although the defense concedes that there is no reported precedent classifying social media as pre-trial publicity. (*Id.* at pp. 14-15). The Commonwealth submits that social media should

not be regarded as pre-trial publicity in connection with a change of venue request, since unlike local newspaper, television and radio reports which are seen or heard by people within the relevant geographic community, viewers of social media "come from all over the world." (*Id.* at pp. 41, 48). Nevertheless, the Commonwealth acknowledges that social media is "a consideration because it exists." (*Id.* at p. 47).

One appellate court from another jurisdiction has concluded that social media commentary was "insufficient to trigger a presumption of prejudice" absent proof that the cited comments were "representative" of the individuals who were eligible to serve as jurors in the county of prosecution. *See State v. Mammone*, 139 Ohio St. 3d 467, 479 n.1, 13 N.E.3d 1051, 1068 n.1 (2014). A federal district court has similarly reasoned that "hundreds of highly negative comments made online by readers" of an online version of a local newspaper were not proven to be "representative of the hundreds of thousands of individuals who are eligible to serve as jurors" in the relevant forum, *see United States v. Warren*, 989 F. Supp.2d 494, 500 (E.D. La. 2013); whereas another federal trial court has likewise discounted the publicity generated by a local newspaper's online version since it could not be determined what percentage of the website's viewers resided in the community from which the jurors would be chosen. *See United States v. Diehl-Armstrong*, 739 F. Supp.2d 786, 800 (W.D. Pa. 2010) ("In sum, then, though we might generally surmise from the foregoing data that 'goerie.com' has a sizable viewing audience and that the website would hold particular interest for individuals residing in or around the Erie area, there is no way to accurately discern from the present record the number of individuals who actually sat down and read the articles

in question, much less is it clear that they are residents of the seven counties comprising the Erie Division of the Western District of Pennsylvania."). But at least one legal commentator has opined that "[i]t is important for a court to consider, and counsel to argue, that the factors [relevant to a determination of presumptive prejudice] include not only publicity via traditional media, but all forms of social media as well." Kristen R. Brown, *"Somebody Poisoned the Jury Pool: Social Media's Effect on Jury Impartiality,"* 19 Tex. Wesleyan L. Rev. 809, 834 (Spring 2013).

Assuming, without deciding, that social media constitutes "pretrial publicity" for purposes of a change of venue request, Pal still has not established that a change of venue was required. The information contained on "Frankie's Voice" website and Facebook page did not create a presumption of prejudice under Pennsylvania law, nor was it "so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it." *Briggs*, 608 Pa. at 468, 12 A.3d at 314. Only four members of the 101 person venire responded affirmatively to defense counsel's voir dire questions addressing prejudicial exposure to social media comments or postings, and those four individuals were removed from the jury pool. The jurors who decided Pal's fate were questioned daily to ensure that they had not viewed any conventional or social media reports. Therefore, the relevant social media did not prejudice Pal in empanelling an impartial jury which ultimately decided this case.

(4) Sixth Amendment Argument

Although Pal did not cite the United States Supreme Court decision in *Skilling v. United States*, 561 U.S. 358 (2010) in his post-sentence motion or supporting brief, his counsel asserted at the time of oral argument that

the *Skilling* analysis of the sixth amendment to the U. S. Constitution supports the conclusion that it was an abuse of discretion to deny his motion for a change of venue.[7] (T. P. 11/26/14 at pp. 15-21). In *Skilling*, the former chief executive officer of Enron Corporation, Jeffrey Skilling, was charged with securities fraud, insider trading and other federal offenses which garnered significant national media attention. Following his conviction, Skilling argued that his trial "never should have proceeded in Houston" because of "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at him, particularly in the Houston area. *Skilling*, 561 U.S. at 377. The United States Court of Appeals for the Fifth Circuit held that "the magnitude and negative tone of media attention" directed at Enron and Skilling, coupled with a co-defendant's "well-publicized decision to plead guilty" on the eve of Skilling's trial, "created a presumption of juror prejudice." *Id.* at 375, 384.

On appeal, the Supreme Court of the United States observed that "[t]he sixth amendment secures to criminal defendants the right to trial by an impartial jury." *Id.* at 377. However, the *Skilling* Court further stated that "pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial." *Id.* at 384 (quoting *Nebraska Press Assn. v. Stuart*, 427 U. S. 539, 554 (1976)). Thus, it concluded that "[a] presumption of prejudice, our decisions indicate, attends only the extreme

---

7. Because the United States Supreme Court relied upon sixth amendment jurisprudence in fashioning its holding in *Skilling*, the "presumption of prejudice" factors cited in *Skilling* are applicable to this state court proceeding. *See Com. v. Jemison*, 98 A.3d 1254, 1257 (Pa. 2014) ("Pursuant to the Supremacy Clause of the United States Constitution art. VI, cl. 2, this Court, like all state courts, is bound by decisions of the U.S. Supreme Court with respect to the federal constitution and federal substantive law.").

case." *Id.* at 381.

In finding that a presumption of prejudice did not arise in *Skilling*, the United States Supreme Court identified several factors to be considered in determining whether a presumption of juror prejudice exists. The criteria that are relevant to a determination of presumptive prejudice include: (1) the size and characteristics of the community in which the crime occurred; (2) the nature and tone of the pretrial publicity and whether it references a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight;" (3) the passage of time between the commission of the crime and the date of trial; (4) whether the jury's verdicts in the case or any co-defendant's trial "undermine in any way the supposition of juror bias;" and (5) the effect of any co-defendant's admission of guilt.[8] *Id.* at 382-385.

The *Skilling* factors do not support a finding of presumptive prejudice in the case *sub judice*. While the parties have stipulated that Lackawanna County has approximately 214,500 residents according to the most recent census, (T. P. 11/26/14 at p. 16), the content of

_____

8. *Skilling* also deemed relevant any "media interference with court-room proceedings *daring* trial." *Id.* at 392 n. 14 (emphasis in original). *See also, Sheppard v. Maxwell*, 384 U.S. 333, 353, 355 (1966) ("Bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities."); *Estes v. Texas*, 381 U.S. 532, 536 (1965) (holding that the media's overzealous reporting efforts during court proceedings "led to considerable disruption" and denied the "judicial serenity and calm to which [defendant] was entitled."). However, that factor was not applicable since "Skilling d[id] not assert that news coverage reached and influenced his jury after it was empanelled." *Skilling*, 561 U.S. at 382 n.14. The post-trial record submitted by Pal similarly fails to demonstrate that the jury, which was admonished to ignore news coverage and questioned daily regarding possible exposure to news reports, was influenced in any manner by trial publicity after it was selected.

the conventional news coverage and social media did not include "blatantly prejudicial information" that prospective jurors "could not reasonably be expected to shut from sight." The circumstances surrounding Bonacci's murder and the arrests of Dominick and Pal, (i.e., the proffered motive of jealousy over a woman, the accuseds' active participation in search parties and post-murder social media commentary, the lifestyles of the accuseds and their friends, and the accuseds' claims that the other was the culpable assailant) generated considerable news coverage and resulted in the reporters and online readers of *The Times-Tribune* choosing the "Bonacci killing" as the top news story in 2013. *See* "Slaying Tops 2013 Lists," *The Times-Tribune* at pp. A1, A14 (Dec. 29, 2013). But "[p]rominence does not necessarily produce prejudice, and juror *impartiality*...dots not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphasis in original). Only 22 of the 101 members of the venire stated that they had either formed fixed opinions based upon the pretrial news coverage and social media, or could not set aside that publicity and decide Pal's case based upon the evidence and the law. The pretrial publicity in question simply "did not present the kind of vivid, unforgettable information [the U. S. Supreme Court] ha[s] recognized as particularly likely to produce prejudice" in a criminal case. *Id.* at 384.

Furthermore, more than ten months elapsed from the date of Bonacci's murder on July 20, 2013, and the start of Pal's trial on June 2, 2014. *See Rideau v. Louisiana*, 373 U.S. 723, 724, 728 (1963) (defendant's trial commenced less than two months after the murder and the broadcast of defendant's filmed confession by the only local television station). Moreover, the fact that Dominick's jury acquitted him of first-degree murder and conspiracy to commit first-degree murder, notwithstanding the cited news coverage

and social media, reinforces the conclusion that the pretrial publicity did not prevent the empanelling of an impartial jury. *See Skilling*, 561 U.S. at 383 & n.16 (noting the "prime significance" of the fact that "earlier instituted Enron-related prosecutions yielded no overwhelming victory for the government" as the jury in "the first Enron criminal trial...convicted five defendants, but acquitted a former Enron executive."). Additionally, inasmuch as Pal's trial commenced five weeks after the start of Dominick's trial, the impact, if any, of the publicity surrounding Dominick's conviction was mitigated. *Id.* at 384-385 (finding that the trial court "took appropriate steps to reduce" the risk of juror prejudice from a co-defendant's "well-publicized decision to plead guilty" by "delay[ing] the proceedings by two weeks, lessening the immediacy of that development.").

Based upon the totality of the *Skilling* factors, the pretrial publicity in this matter did not rise to the level of "the extreme case" in which a presumption of juror prejudice is justified. The news media reports were factual accounts that were devoid of any reference to a confession by Pal or any prior criminal activity by him, and there was "[n]o evidence of the smoking-gun variety [that] invited prejudgment of his culpability." *Id.* at 383. Thus, the sixth amendment to the United States Constitution did not require a pre-trial change of venue in this case.

In sum, the venue rule in criminal actions "recognizes the necessity of bringing a party to answer for his actions in the place where the crime itself occurred because that is where the evidence and the witnesses will most likely be located," such that "[a] change of venue from the situs of the action to a different locale is permitted only upon

good cause shown."[9] *Com. v. Bethea,* 574 Pa. 100, 114, 828 A.2d 1066, 1075 (2003), *cert. denied,* 540 U.S. 1118 (2004). Under the state and federal standards discussed above, a change in venue was not warranted based upon the pre-trial publicity, and following the removal for cause of certain members of the venire, an impartial jury was selected in this matter. Accordingly, Pal is not entitled to a new trial based upon the denial of a pre-trial change of venue.

## (E) INDIVIDUAL VOIR DIRE

Pal additionally seeks a new trial on the ground that each member of the venire should have been subjected to individual voir dire during the jury selection process. Pennsylvania Rule of Criminal Procedure 631(E) governs the method of voir dire in criminal cases, and provides that "[i]n capital cases, the individual voir dire method must be used, unless the defendant waives that alternative." Pa.R.Crim.P. 631(E). However, in murder prosecutions in which the Commonwealth does not seek the death penalty, the trial judge has the discretion under Rule 631(E)(1) and (2) to utilize either the "individual voir dire and challenge system," or the "list system of challenges." *Com. v. Noel,* 2014 WL 6608948, at *1 (Pa. 2014). In recently describing

---

9. If a change of venue had been granted, Lackawanna County would have been obligated to bear "[a]ll costs accruing from a change of venue." Pa.R.Crim.P. 584(E). Thirty-one of the thirty-two witnesses who testified at trial resided in Lackawanna County or Northeastern Pennsylvania. (T. P. 6/3/14 at pp. 108, 119,173-174, 212, 270-271; T. P. 6/4/14 at pp. 8, 107-108, 158, 182, 221, 277; T. P. 6/5/14 at pp. 4, 15, 52, 67, 186-187, 202, 204; T. P. 6/9/14 at pp. 6, 28, 197, 213, 229-230, 259; T. P. 6/10/14 at pp. 6, 19-20, 78, 112, 152,250; T. P. 6/11/14 at pp. 38, 146-147). Only one witness, Sam Senuk, had relocated from Lackawanna County to the state of Florida by the time of trial. (T. P. 6/4/14 at p. 83). Therefore, if venue had been moved to another forum, Lackawanna County would have been responsible for the transportation and lodging of thirty-one witnesses from Northeastern Pennsylvania, as well as the homicide detectives and prosecutors.

these two alternative methods of voir dire, the Supreme Court in *Noel* explained:

> Thus, under the individual method, the parties examine one prospective juror at a time and must exercise for cause and peremptory challenges to that juror before moving on to an examination of the next, so the decision whether to exercise a peremptory challenge is made without knowledge of the jurors yet to be examined, and with potential for cause challenges remaining. Under the list method, on the other hand, peremptory challenge decisions are made with knowledge of the entire prospective jury pool, and after all for cause challenges have been exercised.

*Id.* at *2.

If the trial judge opts to employ the "list system of challenges" in a non-capital case, the "[p]rospective jurors may be examined collectively or individually regarding their qualifications." Pa.R.Crim.P. 631(E)(2)(b). The plain language of the rule "vests the trial judge in non-capital cases, with discretion in choosing whether potential jurors will be questioned collectively or individually." *Com. v. Delligatti*, 371 Pa. Super. 315, 328-329, 538 A.2d 34, 41 (1988), *app. denied*, 520 Pa. 595, 552 A.2d 250 (1988). In the exercise of that discretion, the trial judge may opt to examine the jurors collectively *and* individually, *see Com. v. Hathaway*, 347 Pa. Super. 134, 144-145, 500 A.2d 443, 448 (1985), and "[t]he practice in non-capital cases of addressing questions to the jurors in a group and then further examining those suspected of prejudice because of their answers has been the custom in many courts of the Commonwealth and been approved by [the Superior] court." *Com. v. Cephas*, 213 Pa. Super. 278, 281, 247 A.2d 662, 664 (1968). In deciding Pal's pre-trial motion for

"attorney conducted, individual voir dire," (Docket entry no. 14 at pp. 12-14), we held:

> In accordance with Pa.R.Crim.P. 631(E)(2)(b), the prospective jurors will initially be examined collectively by the undersigned, with members of the venire thereafter being questioned individually depending upon their responses to earlier inquiries. Although the undersigned will take the lead in conducting the collective and individual examination of the prospective jurors, counsel for the Commonwealth and Pal will be afforded the opportunity to pose questions to the jurors as well, [citation omitted]. Thus, Pal's motion for individual, attorney-conducted voir dire will be granted subject to the above-described limitations set forth in the identified procedure under Rule 631(E)(2)(b) and *Cephas*.

*Com. v. Pal*, 2014 WL 1042276, at *19 (Lacka. Co. 2014).

During the jury selection process, the members of the venire were first questioned collectively by the court, the prosecutor and Pal's counsel, (T. P. 6/2/14 at pp. 9-110, 140-158), and based upon their responses, certain members of the jury panel were thereafter subject to individual voir dire. (*Id.* at pp. 159-173). Pal's counsel was never denied the opportunity to question a prospective juror collectively or individually. (*Id.* at pp. 140-173). Nor was any defense motion to strike a potential juror for cause ever denied. (*Id.* at pp. 110-128, 134-135, 144, 155-158, 174-178).

Relying upon the holding in *Com. v. Johnson*, 440 Pa. 342, 269 A.2d 752 (1970), Pal asserts that it was an abuse of discretion to question *any* jury candidates collectively, rather than subjecting each member of the venire to individual voir dire, due to the extent of the pre-trial

publicity. (Docket entry no. 101 at pp. 43-44). In reply, the Commonwealth notes that Pal's counsel was afforded the opportunity to question any venireperson individually, and submits that it was not an abuse of discretion to utilize "a modified individual voir dire process since counsel for both sides were permitted to question any potential juror outside the presence of the full panel following questions propounded by the trial court and counsel for the parties in open court." (Docket entry no. 103 at pp. 41-43, 45). The Commonwealth argues that "the facts of *Johnson* are quite distinguishable from those in the instant case," since "the *Johnson* Court found the pretrial publicity inflammatory and not factual or objective." (*Id.* at pp. 43-44).

In *Johnson*, the defendant was arrested for attacking assistant superintendent Kelly of the Pittsburgh Police Department eighteen days before his scheduled trial for assault and battery and resisting arrest. According to the pre-trial exhibits that were submitted by defense counsel, eighteen front page articles and editorials not only discussed the defendant's assault of assistant superintendent Kelly during a public meeting, but also referenced defendant's prior arrest record, compared defendant to John Dillinger and A1 Capone, quoted the district attorney as describing defendant as a "hoodlum and criminal" and identifying him "as a spokesman for arsonists, hoodlums, and insurgents," and mentioned defendant's subsequent arrest on unrelated charges, including "a separate assault on some others with a shotgun." *Johnson*, 440 Pa. at 344-347, 269 A.2d at 753-754. The defense also presented "transcripts of various radio broadcasts" and "transcripts of television broadcasts" which included "the reviewing of [defendant's] arrest record and the inflammatory commentary of public officials." *Id.* at 348, 269 A.2d at 755. The trial court denied defendant's request for a continuance of the scheduled

trial based upon the prejudicial pre-trial publicity, and also rejected the defense request to question prospective jurors individually regarding their exposure to the television, radio and newspaper reports. *Id.* at 349-350, 269 A.2d at 756.

On appeal, the Supreme Court stated that "insofar as the publicity consisted of accurate accounts of [defendant's] attack on Kelly, it will not support a finding of prejudice." *Id.* at 350, 269 A.2d at 756. However, the pretrial publicity in *Johnson* also "included detailed accounts of [defendant's] prior record, which would, of course, not have been legally admissible at his trial," as well as "particularly prejudicial" and "deliberately inflammatory... remarks by the district attorney." *Id.* at 350-351, 269 A.2d at 756. In finding that the trial court abused its discretion by denying the defense request for individual voir dire, the Supreme Court reasoned that "[w]hen there is present in a case inflammatory pretrial publicity which creates the possibility that a trial could be prejudiced, there are exactly those circumstances present which require each juror to be questioned out of the hearing of the other jurors." *Id.* at 352-353, 269 A.2d at 757.

Unless the defendant demonstrates the existence of "prejudicial pre-trial publicity," however, individual voir dire of the venire is not warranted. *See Com. v. Berrigan,* 509 Pa. 118, 136, 501 A.2d 226, 236 (1985) (finding no abuse of discretion in conducting collective voir dire concerning pre-trial publicity since "[t]he record before us reveals that most prospective jurors had heard or read about this case," but "most prospective jurors affirmed that they would be able to judge the [defendants] fairly based on the evidence presented at trial."). "The *Johnson* Court was only willing to find an abuse of discretion

because the pre-trial publicity included publication of [defendant's] prior criminal record and publication of inflammatory statements made by the district attorney." *Com. v. Rovinski*, 704 A.2d 1068, 1073 (Pa. Super. 1997), *app. denied*, 555 Pa. 707, 723 A.2d 1024 (1998). If the pre-trial publicity consists of "accurate factual accounts," the "prejudice" element is lacking and the trial court may deny individual voir dire in the exercise of its discretion. *Id.* at 1073-1974.

As stated in Section II(D) above, the pre-trial publicity in this case was factual and objective and did not disclose Pal's prior criminal record.[10] Nor do the news coverage exhibits that have been submitted by Pal contain any inflammatory remarks by the prosecutor. Therefore, individual voir dire of each member of the venire was not mandated. *See Johnson*, 440 Pa. at 350, 269 A.2d at 756; *Rovinski, supra.*

More importantly, Pal's counsel was never denied the opportunity to conduct individual voir dire of any prospective juror who stated that [s]he had seen, read or heard a news report, social media, or conversation regarding Bonacci's murder or the arrest of Pal and Dominick. In fact, at the time of oral argument, Pal's counsel acknowledged that the defense had never been denied any requested individual voir dire during jury selection. (T. P. 11/26/14 at pp. 26-27, 29-30). Absent such

---

10. On May 20, 2013, Pal was charged with simple assault, harassment and disorderly conduct, and on July 29, 2013, he pled guilty to "disorderly conduct — unreasonable noise" in exchange for the withdrawal of the charges for simple assault, harassment and "disorderly conduct — engage in fighting." *See Com. v. Pal*, MJ-45102-CR-212-2013 (Lacka. Co.). Pal had previously been charged with "harassment-subjecting other to physical contact" on February 10; 2012, but that charge was withdrawn on March 26, 2012. *Com. v. Pal*, MJ-45102-NT-080-2012 (Lacka. Co).

a denial, there is no basis in the record to grant Pal a new trial due to the denial of individual voir dire. Thus, Pal's post-trial contention that the voir dire "procedure was far too insufficient to ensure that fair and impartial jurors were chosen for this high-profile, first-degree murder case" is without merit. (Docket entry no. 101 at p. 42).

"'The purpose of voir dire is to ensure the empanelling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court.'" *Noel*, *supra*, at *9 (quoting *Com. v. Marrero*, 546 Pa. 596, 606, 687 A.2d 1102, 1107 (1996)). "The process of selecting a jury is committed to the sound discretion of the trial judge and will be reversed only where the record indicates an abuse of discretion, and the [defendant] carries the burden of showing that the jury was not impartial." *Id.* The jurors in this case were chosen exclusively from those panel members who attested under oath that they could set aside all pretrial publicity and information, and decide the case solely on the trial evidence and the instructions on the law. For the reasons stated above, Pal has not demonstrated that individual voir dire of each prospective juror was required or denied, nor has he satisfied his burden of showing that the jury was not impartial. As a result, Pal's request for a new trial based upon Pa.R.Crim.P. 631(E) will be denied.

### (F) "OTHER ACTS" EVIDENCE

In his final request for post-trial relief, Pal contends that certain evidence was erroneously admitted in contravention of Pennsylvania Rule of Evidence 404(b), which dictates that "evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity." *Com. v. Sherwood*, 603 Pa. 92, 114, 982 A.2d 483, 497 (2009). The admission of

evidence of other acts is solely within the discretion of the trial court, and the court's decision will not be disturbed absent an abuse of that discretion. *Patterson*, 91 A.3d at 68. "While it is true that evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible where relevant for another purpose." *Com. v. Green*, 76 A.3d 575, 583 (Pa. Super. 2013), *app. denied*, 87 A.3d 318 (Pa. 2014). Pennsylvania Rule of Evidence 404(b)(2) expressly provides that evidence of other crimes or acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Com. v. Ferguson*, 2015 WL 49438, at *3 (Pa. Super. 2015) (quoting Pa.R.E. 404(b)(2)).

To ensure that "the exceptions cannot be stretched in ways that effectively eradicate the rule," there must be "a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question." *Com. v. Ross*, 57 A.3d 85, 104 (Pa. Super. 2012) (*en banc*), *app. denied*, 621 Pa. 657, 72 A.3d 603 (2013). Even if one of the enumerated exceptions in Rule 404(b)(2) is applicable, "[i]n a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). In the context of "prior bad acts" evidence, "'unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Com. v. Hairston*, 84 A.3d 657, 666 (Pa. 2014), *cert. denied*, 135 S.Ct. 164 (U.S. 2014).

Pal filed a series of motions *in limine* seeking pre-trial

rulings regarding the admissibility of "prior bad acts" evidence under Pa.R.E. 404(b). (Docket entry nos. 27, 31, 39, 51, 54, 57). Pal sought to preclude evidence that Pal, Dominick and several of their friends had "*La Familia*" tattoos signifying their self-proclaimed gang and solidarity, that Pal had fired a weapon at or near Maribeth Castaldi and Emily Gilgallon, and that Pal had threatened or assaulted Ms. Gilgallon and Michael Castellano. (Docket entry no. 27 at ¶ 15; Docket entry no. 31 at pp. 2-3). In barring any "*La Familia*" reference, we reasoned that the "'*La Familia* tattoos and association by Pal, Dominick and their friends appear to be nothing more than misguided and sophomoric attempts at bravado, rather than visual identification with an organized criminal enterprise or recognized gang as in [*United States v.*] *Torres-Chavez*, [744 F.3d 988 (7th Cir. 2014), *Com. v.*] *Burgos*, [462 Mass. 53, 965 N.E.2d 854 (2012)] and *Santistevan* [*v. City of Colorado Springs*, 2013 WL 438532 (D.Colo. 2013)]," and "[a]s such, they lack the connective relevance and evidentiary value required by [*Commonwealth v.*] *Gwaltney*, [497 Pa. 505, 442 A.2d 236 (1982)] and its progeny, and their admission would unfairly prejudice Pal and Dominick." *Com. v. Pal*, 2014 WL 1632248, at *6 (Lacka. Co. 2014). We further agreed with the defense that, "since Pal has not been charged with murder as the principal, any evidence related to his prior discharge of weapons in the presence of Maribeth Castaldi and Emily Gilgallon lacks 'a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question.'" *Id.* at *8 (quoting *Ross*, 57 A.3d at 104). Additionally, we held that "the probative value of Pal's violent acts toward Emily Gilgallon and Michael Castellano [wa]s outweighed by the potential for unfair prejudice" and "b[ore] no relevance to Pal's accomplice liability in this case." *Id.* at *8. As a result,

the Commonwealth was prohibited from introducing any such evidence at the time of trial. *Id.* at *9.

However, Pal's acquisition of a .38 caliber handgun from Cameron Kashmer, Pal's discharge of that weapon into his garage wall, and a photograph of Pal openly displaying a handgun in the waistband of his pants were admissible pursuant to the "opportunity" exception in Rule 404(b)(2) in that this evidence supported the Commonwealth's theory that Pal had the means to furnish Dominick with the murder weapon and ammunition, and did so on the morning of July 20, 2014. In light of the pre-trial opinion expressed by the firearm and tool mark examiner, Cpl. Elwood Spencer, that bullet projectiles removed from the wall of Pal's garage had similar lands, grooves and cannelures characteristics as the wad cutter bullet removed from Bonacci's head, we concluded:

> Rule 404(b)(2) states that proof of prior bad acts is admissible for the purpose of proving "opportunity." Pa.R.E. 404(b)(2). It is well settled that "[a] weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime." *Com. v. Williams*, 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994); *Com. v. Brown*, 71 A.3d 1009, 1014 (Pa. Super. 2013), *app. denied*, 77 A.3d 635 (Pa. 2013). Evidence that the defendant possessed any other device or instrument that could have been used in a murder is admissible pursuant to the "opportunity" exception set forth in Rule 404(b)(2). *See Com. v. Reese*, 31 A.3d 708, 726 (Pa. Super. 2011) (*en banc*) (defendant's prior display and use of "a knife

in a retail store in broad daylight" was admissible since murder victim died from stab wounds); *Com. v. Miller*, 897 A.2d 1281, 1287-1288 (Pa.Super. 2006) (knife set retrieved from defendant's truck was admissible to show that defendant "was in possession of a knife which could have been one of the murder weapons."), *app. denied*, 588 Pa. 789, 906 A.2d 1196 (2006); *Com. v. Akers*, 392 Pa. Super. 170, 186-188, 572 A.2d 746, 754 (1990) (witness properly permitted to testify that defendant had previously shown her a gun similar to the murder weapon), *app. denied*, 526 Pa. 627, 584 A.2d 310 (1990). For that reason, evidence of handguns and ammunition seized from a defendant's home is "relevant as tending to prove that the defendant had weapons similar to the ones used in the perpetration of the crime," and any "[uncertainty whether the weapons evidence was actually used in the crime goes to the weight of such evidence, not its admissibility." *Com. v. Owens*, 929 A.2d 1187, 1191 (Pa. Super. 2007), *app. denied*, 596 Pa. 705, 940 A.2d 364 (2007).

The Commonwealth contends that Pal provided Dominick with the .38 caliber handgun and wad-cutter type practice bullet used to kill Bonacci. In light of corporal Spencer's opinions regarding the projectiles removed from the wall of Pal's garage, as well as the unused ammunition seized from that garage, evidence relating to Pal's ownership and discharge of wad-cutter practice bullets from a .38 caliber handgun is clearly relevant to Pal's accomplice liability. If, as Pal advocates, the Commonwealth is denied the opportunity to present evidence that Pal fired bullets into his garage wall, the jury may be inclined to conclude that Pal did not fire the retrieved projectiles into the garage wall, and that those projectiles were fired by someone other

than Pal. In that event, Pal would be able to argue, without evidentiary rebuttal by the Commonwealth, that some other individual owned or controlled the bullets that were fired into the garage wall. To support its argument that Pal had the "opportunity" to furnish Dominick with the gun and bullet that were used to kill Bonacci, the Commonwealth is entitled to offer evidence that Pal fired bullets into his garage wall, which were later seized by the police and ultimately served as the basis for corporal Spencer's analysis and conclusion. *See, Owens, supra.* While that evidence may not be admissible under the *res gestae* exception, it is relevant and admissible under the "opportunity" exception in Rule 404(b)(2) to establish that Pal had the means to provide Dominick with the gun and bullet that he used to kill Bonacci. As a result, Pal's motion *in limine* to bar the Commonwealth from referencing Pal's discharge of firearms in his garage will be denied.

*Id.* at *4.

Based upon the holding in *Com. v. Williams*, 58 A.3d 796, 801 (Pa. Super. 2012), *app. denied*, 620 Pa. 708, 68 A.3d 908 (2013), the photograph of Pal brandishing a handgun in his waistband was deemed admissible to show his possession and control of a weapon similar to the one used to kill Bonacci. *Pal, supra*, at *6. As proof of Pal's accomplice liability, the Commonwealth was also "permitted to present evidence that Cameron Kashmer provided a .38 caliber handgun to Pal in March 2013 in partial payment of an outstanding debt," but was "prohibited from mentioning (a) that Mr. Kashmer originally purchased that weapon from an unidentified male at Pal's garage, and (b) that his indebtedness to Pal was attributable to a gambling debt. *Id.* at *7. Last, it is

noteworthy that although Pal objected to any evidence of the "*La Familia*" tattoos, he did not seek to preclude any reference to the "*b'hai*" tattoos imprinted on Dominick and Pal, nor did he object to the admission of that evidence during trial. (T.P. 6/11/14 at pp. 99-101).

Pal asserts that it was an abuse of discretion to allow "negative character evidence, including the firing of guns in [Pal's] garage, his possession of various firearms, holsters and ammunition, gang references including [Pal's] alleged participation in '*La Familia*,' the fact that [Pal] and Mr. Dominick had the same tattoo of '*b'hai*' (hindi for 'brother'), and other alleged prior violent acts and conduct of Mr. Pal." (Docket entry no. 98 at ¶ 12). Pal also argues that "[a]nother area of irrelevant character evidence was the infamous breakfast at Chick's Diner within hours of the murder." (Docket entry no. 101 at p. 47). In seeking a new trial, Pal alleges that "[a]dmitting the aforementioned 'bad acts' evidence in [Pal's] trial wrongly permitted the jury to draw the improper and prejudicial inference that Mr. Pal was 'a bad or evil' man 'of unsavory character' and thus was capable of and had the propensity for acting as an accomplice in the murder of the victim." (Docket entry no. 98 at ¶18).

The pre-trial order dated April 23, 2014, sustained Pal's objections to any "*La Familia*" evidence and precluded the Commonwealth "from referencing or introducing evidence of...the defendants' '*La Familia*' tattoos and association...." *Pal, supra*, at *9. Hence, Pal's post-trial contention that evidence of "gang references including [Pal's] alleged participation in '*La Familia*'" was erroneously admitted at trial is devoid of merit. Although evidence was presented that Pal and Dominick both had tattoos of the hindi word for "brother," Pal never objected

to the introduction of that evidence, and in the process, he waived his objection to that evidence under Pa.R.E. 103(a)(1)(A). *See Com. v. Hairston,* 84 A.3d 657, 672 (Pa. 2014) (defendant waived objection to victim-impact testimony by failing to object at trial), *cert. denied,* 135 S. Ct. 164 (U.S. 2014). Moreover, that tattoo evidence was admissible to demonstrate the close bond between Pal "the leader" and Dominick "the follower", as part of the Commonwealth's proof of their shared "plan" to kill Bonacci and the absence of any alleged surprise to Pal in that respect.[11]

Pal's possession of firearms, including a .38 caliber handgun, and wad cutter bullets was admissible to prove that he had the "opportunity" to act as an accomplice and conspire with Dominick to kill Bonacci by providing a handgun and wad cutter bullets to a principal who did not own a handgun. *See, Williams,* 537 Pa. at 20, 640 A.2d at 1260. Evidence that Pal fired a wad cutter bullet from an unregistered .38 caliber handgun into the wall of his garage was similarly admissible to demonstrate his possession of an instrument that could have been used in the murder, as reflected by the testimony of the firearm and tool mark examiner and the forensic pathologist. *See Reese,* 31 A.3d

---

11. The Commonwealth contends that "the tattoos in question are not 'prior bad acts' as proscribed by Pa.R.E. 404(b)" since "[t]here was no suggestion at trial that the '*b'hai*' tattoos displayed on [Pal] or Mr. Dominick related to a crime or bad act." (Docket entry no. 103 at p. 47). However, the Supreme Court of Pennsylvania recently rejected such an argument, and reasoned:

> The Commonwealth's argument that this evidence is not "prior bad acts" evidence since it does not involve criminal acts or misconduct is without merit. The term "prior bad acts" commonly refers to Rule 404(b), which does not apply only to acts that are "bad" or immoral in nature. Rule 404(b) makes no such distinction. It not only concerns prior crimes or "bad" conduct but also relates to other acts or conduct.

*Com. v. Towles,* 2014 WL 5094266, at *7 n.6 (Pa. 2014).

at 726. Additionally, Pal's actions at the diner within a few hours of the murder were admissible to demonstrate his conscious effort to divert any investigatory focus upon him and to conceal his involvement with the murder of Bonacci.

The limited "other acts" evidence that was admitted during the trial bore the requisite "connective relevance" to the crimes at issue. Furthermore, the probative value of that evidence outweighed its potential for unfair prejudice. Accordingly, Pal has not established that it was an abuse of discretion to allow certain "other acts" evidence at trial, and his motion for a new trial based upon the admission of that evidence will be denied.

### ORDER

And now, this 9th day of January, 2015, upon consideration of "Defendant's Post-Sentence Motions" (Docket entry no. 92), "Defendant's Supplemental Post-Sentence Motions" (Docket entry no. 98), the memoranda of law submitted by defendant and the Commonwealth (Docket entry nos. 101, 103), and the oral argument of counsel on November 26, 2014, it is hereby ordered and decreed that:

1. "Defendant's Post-Sentence Motions" and "Defendant's Supplemental Post-Sentence Motions" seeking a judgment of acquittal, an arrest of judgment and a new trial under Pa.R.Crim.P. 720(B)(1)(a)(ii), (iii) and (iv) are denied and;

2. Pursuant to Pa.R.Crim.P. 720(B)(4), the defendant is advised in writing of his rights (a) to appeal the denial of his motions to the Superior Court of Pennsylvania within thirty (30) days of the filing of this order, (b) to the assistance of counsel in the preparation of his appeal,

and (c) to appeal *in forma pauperis* and to proceed with assigned counsel as provided in Pa.R.Crim.P. 122.